# MANNING, COLLECTOR OF INTERNAL REVENUE, *v.* SEELEY TUBE & BOX CO.

No. 70.   Argued November 17–18, 1949.—Decided February 6, 1950.

*Solicitor General Perlman* argued the cause for petitioner. With him on the brief were *Assistant Attorney General Caudle, Ellis N. Slack, Lee A. Jackson* and *I. Henry Kutz.*

*Walter J. Bilder* and *George G. Tyler* argued the cause for respondent. With them on the brief were *Nathan Bilder* and *William J. Nolan, Jr.*

*Gorden F. DeFosset* filed a brief, as *amicus curiae,* supporting petitioner.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

The facts of this case have been agreed upon by stipulation. On December 15, 1941, respondent taxpayer, a New Jersey corporation, filed a corporate tax return for its fiscal period, January 1, 1941, to September 30, 1941. On January 12, 1942, the Commissioner of Internal Revenue assessed the tax,[1] which respondent timely paid. Respondent was adjudged a bankrupt and a receiver was appointed on July 7, 1943. On August 2, 1943, the Commissioner, using the accelerated procedure applicable in bankruptcy cases,[2] assessed deficiencies in the 1941

---

[1] The payment in question included corporate income tax, defense tax and excess profits tax. No question is presented as to the correctness of the defense tax payment.

[2] Int. Rev. Code § 274 (a): "Upon the adjudication of bankruptcy of any taxpayer in any bankruptcy proceeding or the appointment of a receiver for any taxpayer in any receivership proceeding before any court of the United States or of any State or Territory or of the District of Columbia, any deficiency (together with all interest, additional amounts, or additions to the tax provided for by law)

taxes with interest from the date the tax was properly due to the assessment date.[3]

On March 3, 1944, respondent filed its return for the fiscal period from October 1, 1942, to September 30,

determined by the Commissioner in respect of a tax imposed by this chapter upon such taxpayer shall, despite the restrictions imposed by section 272 (a) upon assessments be immediately assessed if such deficiency has not theretofore been assessed in accordance with law. In such cases the trustee in bankruptcy or receiver shall give notice in writing to the Commissioner of the adjudication of bankruptcy or the appointment of the receiver, and the running of the statute of limitations on the making of assessments shall be suspended for the period from the date of adjudication in bankruptcy or the appointment of the receiver to a date 30 days after the date upon which the notice from the trustee or receiver is received by the Commissioner; but the suspension under this sentence shall in no case be for a period in excess of two years. Claims for the deficiency and such interest, additional amounts and additions to the tax may be presented, for adjudication in accordance with law, to the court before which the bankruptcy or receivership proceeding is pending, despite the pendency of proceedings for the redetermination of the deficiency in pursuance of a petition to the Tax Court; but no petition for any such redetermination shall be filed with the Tax Court after the adjudication of bankruptcy or the appointment of the receiver."

[3] Deficiencies were assessed both as to the normal income tax and as to the excess profits tax.

Further deficiencies were assessed March 21, 1944. The interest on these deficiencies amounted to $82.66, whereas the interest on the deficiencies assessed in August, 1943, totaled $4,430.68. We feel that any possible difference in result attributable to the timing of the assessment has little effect on the amount to which taxpayer might be entitled in this case, and we do not consider this factor.

The record is bare of any claim or payment of interest from the date of the assessment of the deficiency until the date of the claim of the refund. See Int. Rev. Code § 294 (b).

Respondent does not urge and we need not decide the applicability of *City of New York* v. *Saper,* 336 U. S. 328 (1949), where we held that under the circumstances of that case, bankruptcy terminated the running of interest on claims against the bankrupt. In view of the facts that respondent was revested with title to its assets on June

1943, showing a net operating loss [4] for that year. This loss, when carried back in accordance with § 122 (b) (1) of the Internal Revenue Code,[5] was sufficient to abate completely respondent's tax liability for 1941. Respondent then filed claims for a refund of that part of the 1941 tax which had already been paid, and for the abatement of the assessed deficiency and interest. The Commissioner abated the deficiency, but refused to refund all the tax which had been paid, retaining an amount equal to the interest which had been assessed on the deficiency.

Respondent then sued the Collector for the interest. The District Court sustained the Collector, holding that the payment of the interest remained an obligation of the taxpayer, even though the assessed deficiency had itself been abated. 76 F. Supp. 937 (1948). The Court of Appeals reversed, holding that the carry-back, in wiping out the debt of the tax deficiency, must also have wiped out the interest which had been assessed on that deficiency. 172 F. 2d 77 (1948). Because of the frequency of the use of the carry-back provision of the

---

4, 1945, and that the period between the bankruptcy and the major part of the assessment was less than a month, we do not feel that the holding of that case could effect any significant change in the disposition of the problem at hand.

[4] Int. Rev. Code § 122 (a): "As used in this section, the term 'net operating loss' means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d)."

[5] Int. Rev. Code § 122 (b) (1): "If for any taxable year beginning after December 31, 1941, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-back for each of the two preceding taxable years, . . . ."

The carry-back operated similarly on the excess profits tax. 26 U. S. C. §§ 710, 728, 729 (1946). The entire excess profits section of the Code, passed in 1940, 54 Stat. 975, was repealed in 1945, 59 Stat. 568.

Internal Revenue Code, we granted certiorari. 337 U. S. 955 (1949).

The general statutory scheme which presents the problem is as follows: As of a certain date the taxpayer has a duty to file a return for the previous fiscal year and pay the amount of the tax actually due for that year.[6] If this return is erroneously calculated and the payment is less than the tax properly due, the Commissioner, using the procedure appropriate to the particular situation, may assess a deficiency, the difference between the tax imposed by law and the tax shown upon the return.[7] Interest upon this deficiency at the rate of six per cent from the date the tax was lawfully due to the date of the assessment is assessed at the same time as the deficiency.[8] If a net operating loss is subsequently sustained, that loss may be carried back and added to the deductions for the two previous taxable years, with appropriate adjustments in the tax liability for those years. The problem with which we are concerned in this case is whether the interest on a validly assessed deficiency is abated when the deficiency itself is abated by the carry-back of a net operating loss.

We hold that the interest was properly withheld by the Collector. The subsequent cancellation of the duty to pay this assessed deficiency does not cancel in like manner the duty to pay the interest on that deficiency. From the date the original return was to be filed until the date the deficiency was actually assessed, the taxpayer had a positive obligation to the United States: a duty to pay its tax. See *Rodgers* v. *United States,* 332 U. S. 371, 374 (1947)'; *United States* v. *Childs,* 266 U. S. 304,

---

[6] See Int. Rev. Code §§ 52 (a), 53 (a), 56 (a). The tax may also be paid in quarterly installments. Int. Rev. Code § 56 (b).

[7] Int. Rev. Code § 271 (a).

[8] Int. Rev. Code § 292 (a).

309–310 (1924); *Billings* v. *United States,* 232 U. S. 261, 285–287 (1914). For that period the taxpayer, by its failure to pay the taxes owed, had the use of funds which rightfully should have been in the possession of the United States. The fact that the statute permits the taxpayer subsequently to avoid the payment of that debt in no way indicates that the taxpayer is to derive the benefits of the funds for the intervening period. In the absence of a clear legislative expression to the contrary, the question of who properly should possess the right of use of the money owed the Government for the period it is owed must be answered in favor of the Government.

It is apparent from an inspection of the Code that Congress intended the United States to have the use of the money lawfully due when it became due. Several sections of the Code prescribe penalties and additions to the tax for negligence and fraud.[9] A taxpayer who files a timely return but does not pay the tax on time must pay interest on the tax until payment.[10] Even when the Commissioner, at the request of the taxpayer, authorizes an extension of the time of payment, interest must be paid by the taxpayer for the period of the extension.[11] And when the Commissioner assesses a deficiency he also may assess interest on that deficiency from the date the tax was due to the assessment date.[12]

The enactment of the carry-back provision in 1942 did not change this policy of the statute requiring prompt payment. This section was intended to afford taxpayers an opportunity to present for tax purposes a realistic, balanced picture of their profits and losses. It permits a taxpayer to add a net operating loss for one year to

[9] *E. g.,* Int. Rev. Code §§ 291 (a), 293 (a), (b).

[10] Int. Rev. Code § 294 (a) (1).

[11] Int. Rev. Code §§ 56 (c) (1), 295.

[12] Int. Rev. Code § 292 (a).

the deductions for the two previous taxable years. The Report of the Senate Committee on Finance states that the purpose of the section was to afford relief to cases where maintenance and upkeep expenses were deferred to peacetime years because of wartime restrictions. S. Rep. No. 1631, 77th Cong., 2d Sess. 51–52 (1942). But there is no indication that Congress intended to encourage taxpayers to cease prompt payment of taxes. The same Report, explaining the operation of the section which became the present carry-back provision, states, "A taxpayer entitled to a carry-back of a net operating loss or an unused excess profits credit . . . will not be able to determine the deduction on account of such carry-back until the close of the future taxable year in which he sustains the net operating loss or has the unused excess profits credit. *He must therefore file his return and pay his tax without regard to such deduction,* and must file a claim for refund at the close of the succeeding taxable year when he is able to determine the amount of such carry-back." S. Rep. No. 1631 at 123–124. (Italics added.) We can imagine no clearer indication of a congressional understanding and intent that the carry-back was not to be interpreted as deferring or delaying the prompt payment of taxes properly due.

Although it is true that for many purposes the carry-back is equivalent to a *de novo* determination of the tax, our conclusion that this section does not retroactively alter the duty of a taxpayer to pay his full tax promptly is amply supported by § 3771 (e) of the Code.[13]

---

[13] Int. Rev. Code § 3771 (e): "If the Commissioner determines that any part of an overpayment is attributable to the inclusion in computing the net operating loss deduction for the taxable year of any part of the net operating loss for a succeeding taxable year or to the inclusion in computing the unused excess profits credit adjustment for the taxable year of any part of the unused excess profits

That section, an integral part of the carry-back provision, prohibits a taxpayer who does pay a tax which is subsequently abated by a carry-back from claiming interest from the Government for the intervening period. It is clear, therefore, that Congress in 1942 did not intend to change the basic statutory policy: the United States is to have the possession and use of the lawful tax at the date it is properly due.

To sustain respondent's contention would be to place a premium on failure to conform diligently with the law. For then a taxpayer who did not pay his taxes on time would receive the full use of the tax funds for the intervening period, while the taxpayer who did obey the statutory mandate and pay his lawful taxes promptly would be prohibited by § 3771 (e) from having the use of the money for that period. We cannot approve such a result.

Any other interpretation would be inconsistent with the present structure of the Code, as amended by § 4 (a) of the Tax Adjustment Act of 1945, 59 Stat. 519, now §§ 3779 and 3780 of the Code. Prior to 1945, the Commissioner had power to authorize, at the request of the taxpayer, an extension of time for the payment of taxes, and interest on such an extension was charged at the rate of six per cent.[14] The Tax Adjustment Act of 1945 was passed to improve the cash position of taxpayers by allowing them to defer current tax payments if there was a reasonable chance that these payments would be returned to them in the future because of business losses, and to speed up the refund of taxes paid. H. R. Rep. No. 849, 79th Cong., 1st Sess. 1–6 (1945); Joint Committee

credit for a succeeding taxable year, no interest shall be allowed or paid with respect to such part of the overpayment for any period before the filing of a claim for credit or refund of such part of the overpayment or the filing of a petition with the Tax Court, whichever is earlier; . . . ."

[14] Int. Rev. Code §§ 56 (c), 295.

on Internal Revenue Taxation, Rep. No. 1, 79th Cong., 1st Sess. 6–9 (1945). Under § 3779 a corporation filing its return for the preceding tax year has the right to obtain an extension of time for the payment of the tax for that preceding year. This extension may be obtained if the corporation expects to suffer, in the fiscal year in which the return is filed, a net operating loss sufficient to diminish, by a carry-back, its tax liability for the preceding tax years. At the close of that year, the taxpayer may file, under § 3780, an application for a tentative readjustment of taxes for preceding years, including a quick refund of taxes paid or an abatement of taxes which have been deferred. A corporation which does take advantage of these provisions is not completely absolved from the payment of interest on deferred taxes actually abated. For § 3779 (i) expressly provides that the corporation must pay three per cent interest on deferred taxes actually abated by the carry-back and six per cent on those not abated. Again it is apparent that the Code contemplates timely payment of taxes and subsumes the right of the United States to the interim use of the tax payments.

It is argued that the conclusion that respondent is not entitled to a refund of the assessed interest is unfair, allegedly discriminating against a taxpayer whose deficiency is assessed under the accelerated bankruptcy procedure in favor of one whose deficiency is assessed under § 272 (a) (1), the more customary "90-day letter" Tax Court procedure. This section provides that in the usual case the Commissioner must notify the taxpayer that he intends to assess a deficiency against him. The taxpayer is then allowed ninety days in which to file a petition with the Tax Court for a redetermination of the alleged deficiency, and the Commissioner is restrained from assessing any deficiency until the decision of the Tax Court becomes final. Nor may the Commissioner assess more than the amount the Tax Court determines to be the

deficiency. Section 292 (a), providing for interest on deficiencies, states, "Interest upon the amount determined as a deficiency shall be assessed at the same time as the deficiency . . . ." The argument is that if there is no deficiency there can be no interest, and, it is further urged, the Tax Court will normally arrive at a result of no deficiency, for it will take into consideration the net operating loss carry-back in its redetermination. Therefore, no interest will be assessed.

At the time of the principal assessment in this case, however, the net operating loss had not yet been reported. Nor has the validity of the deficiency assessment been challenged at any time throughout the litigation. Thus, the comparable situation to the instant case would be, if, before the net operating loss was claimed, the Tax Court was confronted with a deficiency determined by the Commissioner. We see no reason why that method of assessment, or any of the others authorized by statute, would arrive at a different figure because of an unclaimed net operating loss. Whether the language of the Code requires a different result when the loss is claimed before the attempted assessment of the deficiency is a question which is not considered by us on this record. We hold that where a deficiency and interest have been validly assessed under any applicable statutory procedure, a subsequent carry-back with an abatement of the deficiency does not abate the interest previously assessed on that deficiency.

Respondent also places great reliance on the principle that "interest is an accretion to and part of the tax," and, therefore, must be abated when the tax is abated. The cases to which we have been referred in support of this principle deal with compromises of taxes which were incorrectly assessed at the outset, and not, as here, with a subsequent abatement of a tax correctly assessed. As such, they are not persuasive of a contrary result.

Two administrative rulings [15] on the carry-back provision of the Revenue Act of 1918, 40 Stat. 1057, are cited as opposed to this interpretation of the Code. We see no need to distinguish these regulations or decisions. Two rulings relating to a carry-back section of twenty-five years ago, not repeated in the intervening quarter-century, are not sufficient to force us to conclude that Congress intended to impart their construction of that section to the present provision.

We have considered the remainder of the points raised by the court below and respondent, but for the foregoing reasons are in accord that the judgment of the Court of Appeals must be reversed and the judgment of the District Court affirmed.

*Reversed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

---

[15] L. O. 1115, II–2 Cum. Bull. 221 (1923); I. T. 1447, I–2 Cum. Bull. 220 (1922).