John Welborn Pusser v. Commissioner.
Pusser v. Commissioner
Docket No. 23523.
United States Tax Court
1951 Tax Ct. Memo LEXIS 25; 10 T.C.M. (CCH) 1140; T.C.M. (RIA) 51360; December 7, 1951
James E. Leppard, Esq., Chesterfield, S.C., for the petitioner. Wm. W. Oliver, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves Federal income taxes for the calendar years 1943 to 1947, inclusive. Deficiencies and penalties were determined as follows: Deficiency
Penalty
1943
$ 717.52
$ 35.88
1944
845.53
42.28
1945
3,500.11
175.01
1946
3,406.40
170.32
1947
26.92
1.35
Total
$8,496.48
$424.84 The questions presented are whether the determinations by the Commissioner were arbitrary and erroneous, whether the respondent is estopped to assert a deficiency for 1943, whether the Commissioner erred in determining income upon a basis of net worth statements and in the inventories used, whether the petitioner is liable *26 for the 5 per cent negligence penalty, and whether he is entitled to a net operating loss carry-back from 1948, and the amount thereof. Findings of Fact The petitioner resides at Chesterfield, South Carolina, and filed the Federal income tax returns here involved with the collector for the district of South Carolina. During the taxable year he operated, as sole proprieter, a retail dry goods store at Chesterfield, South Carolina, a town with a population of about 700; also owned and farmed a farm of 69 acres, of which 45 to 50 acres were cultivable. Cotton and some corn was produced during some or all of the taxable years. Income from the farm was included with income from the store. Farming was a side line with petitioner, and he kept no record on the farming activities. For the store, books of account were kept on a single entry basis. They consisted of a purchase journal, a record of payment of expenses, a record of personal expenses along with store expense, a record of inventory, and sheets showing sales summaries, labeled "daily sales" and showing only dates and amounts without other explanation. The sales summary sheets cover 1943-1946, inclusive. Some dates, not Sundays, *27 are not shown, and no sales on such days are shown. No cash account was kept. Petitioner's cash register did not have a tape so that no cash register taxes were kept. No sales slips were kept, and there were no daily bank deposit statements against which to verify daily sales. The petitioner did not deposit the store's receipts daily in bank, but, in general, made deposits when checks were written to be covered by the deposit. He ordinarily carried large amounts of money on his person. He had about $15,000 in his possession on January 1, 1943, of which a part was spent for a home and about $5,800 went into the business. The purchase journal (beginning January 1, 1944 with none shown earlier) in general shows on the left hand sheet a record of invoices for purchased merchandise, each entry showing only the date, name of seller, and amount. On the right hand sheet is in general shown a journal of expenses, consisting of a list of checks showing only date, name of the payee and amount, without other explanation. The entries are often not shown in chronological order. Such expense journal contained items relating to the store and personal expenses of the petitioner. No schedule of personal *28 expenses was produced at trial. In general, petitioner paid his bills in time to receive discounts, but no record was kept thereof. In October 1946 such discounts amounted to $286.75. The amounts at other times do not appear of record. The invoices, but not the discounts, were used and considered in making up the petitioner's records of purchased merchandise in computing the income shown on his returns. The amount of inventory for the respective dates as reported by the petitioner and determined by the respondent are as follows: Date
Petitioner
Respondent
1- 1-43
$12,250.00
$14,851.90
12-31-43
10,780.00
12,755.78
12-31-44
15,122.47
16,176.40
12-31-45
12,500.45
18,463.03
12-31-46
13,399.59
20,156.83
12-31-47
16,013.37
28,268.66
The Commissioner in determining the deficiencies added to the inventory values shown on petitioner's books the amount of accounts payable, to arrive at inventory. The Commissioner determined the deficiencies involved on a basis of increase in net worth, adding living expenses, Federal income taxes paid, contributions, and life insurance premiums. When one Howle, the revenue agent, first called petitioner was absent *29 and after examining petitioner's records he left with petitioner's son, for petitioner, a list of items, including bank statements, checks and invoices. The son referred the agent to one Knight, an attorney, who had made out the returns, except for 1947, from records available to him, and the agent went to see Knight. Later, after the petitioner returned, the agent went to the store and asked for the books and records. He saw and looked at certain records and decided that the petitioner's records were inadequate to reflect net income. He insisted on the figures as to how much money petitioner had and petitioner gave them to him. He told petitioner to retain an accountant. He never suggested an accountant by name. The petitioner employed one Gregory, a certified public accountant. Gregory had finished the University of South Carolina in accounting, had taught that subject there for several years, and has a good reputation with the Charleston division of the Internal Revenue Bureau. Gregory asked petitioner how much money he had at a certain time and was told how much petitioner owed and was given the information that was necessary on that line. Later, at the request of Gregory, Howle *30 went to Gregory's office and there met the petitioner; the three were together. Gregory produced a net worth statement and explained it to the petitioner; the agent went over the statement. They discussed the adjustments in the net worth statement with him after it was made up. Gregory explained how he had arrived at the income and stated that in his opinion the use of net worth determination was the best way to arrive at the income of the petitioner. Petitioner was present. Gregory said that there was no control over cash, that the petitioner did not deposit his cash receipts in the bank in toto and kept large amounts of cash on his person; also that it was very difficult to obtain the balance at any one day on accounts receivable, and there was doubt in his mind as to the proper amount of inventories. No agreement was reached at that meeting in regard to petitioner's tax liability. Later, Howle checked with the bank at Chesterfield as to bank balances and notes payable. He looked at petitioner's accounts receivable ledger. He talked to the petitioner about his inventories. Gregory was not then present. The petitioner said that he had a practice of taking inventory at 50 per cent *31 of value and that his record of inventories was obsolete. Howle checked this and found it to be true. Petitioner stated that the total cost of inventory would probably run around $40,000 to $50,000 but that the value was not there. To a great extent Howle adopted the net worth statement drawn up by Gregory. He first saw it when the parties met in Gregory's office to check Gregory's schedule of net worth and he was willing to accept his audit except for some adjustments. He made adjustments to it, including reducing living expenses added to the increased net worth to a figure he thought more equitable. In making his adjustments he followed Gregory's adjustment, which was to take the petitioner's inventories and add current accounts payable on the theory that these goods were fresh and salable. The adjustments made by Howle of the net worth statement drawn up by Gregory lowered the petitioner's tax liability. After finding the condition of petitioner's books, Howle relied upon Gregory to dig out what he could from them. He never went through all of petitioner's books. Practically all of the items of assets and liabilities contained in the net worth statement which Howle finally made *32 were taken from Gregory's evidence and not upon Howle's own examination of the records or facts. Howle had in Court at trial the net worth statement made up by Gregory with depreciation schedules. About two days before trial Howle worked on the books in an amount about equal to what he had done before. He did not find discounts anywhere in the records. If the record showed purchases in gross amount and checks paid, the checks could be subtracted to arrive at the discount. It is common policy of the Bureau to suggest to a taxpayer that he retain an accountant where an audit of his books will require a great deal of work, and agents are permitted to make net worth statements upon audits made by private tax consultants, after checking their figures, and submit them to the Commissioner. The petitioner signed a written form agreeing with the deficiency determination. He had said he would not sign it but finally did and then requested that it be withdrawn and got it back. A second time he agreed orally but did not sign. Next after Gregory, petitioner called in A. N. Pullen & Company, certified public accountants of Charlotte. Petitioner's accounts payable ledger under date of April 23, 1948, contains *33 a sheet bearing the name A. N. Pullen & Company with a notation reading "Federal tax matters" a debit of $250 dated April 23, 1948, and a credit of $250 dated April 24, 1948. Pullen & Co. looked at petitioner's books and the financial statement Gregory had prepared. Two representatives of A. N. Pullen & Company, Gregory, and Knight had a conference in Knight's office. After discussion of about an hour, A. N. Pullen & Company recommended that the revenue agent's report be accepted by the petitioner. Petitioner's inventory records showed the quantity of articles and the price, but there was no way to verify them; there were no invoices available to check back against the inventory. The only way to tell from the books what an expense was for was by guessing from the name of the payee. The books did not disclose the discount on purchases of merchandise, but the records contained transactions by which a discount could be determined by taking total purchases, less merchandise paid for, less C.O.D. payments, and then adjusting the accounts payable at the beginning and end of the year. Petitioner's sales over the taxable years were about $100,000 a year. His profit was slow. He took a reasonable *34 mark-up. He determined what an article was worth by his own knowledge and put down what it was worth to him. During the war his inventory was at times worth more and at times worth less than it cost him. He has no certain mark-up and no range of mark-up, but as a rule tries to get from 20 to 30 per cent. He has a turn-over of probably from 1 1/2 to 3 times a year. During the war he sometimes had to buy undesirable merchandise in order to get other merchandise. There was a shortage of goods in some things and such shortage would tend to make them more valuable. It was almost impossible to get men's goods during the war. Petitioner had the competition of two chain stores in Chesterfield. Petitioner's income tax return for the year 1943 was checked and audited by a revenue agent named DeChamps who had access to the books and records. Petitioner did not know just what DeChamps did by way of investigation of his records. DeChamps did not criticize the bookkeeping records. Petitioner assented to a tax and paid it in the amount of $600 or $700. Petitioner's returns for 1943 and 1944 did not indicate any income from his farm. The return for 1945 indicated farm income of $899.76 from eight *35 bales of cotton with farm costs of $1,804.76. His return for 1946 indicated farm income of $668 with farm expenses of $690.75. The return for 1947 reported a loss on the farm of $605.45, being $1,598.12 income from cotton with deduction of expenses, depreciation and losses in the amount of $2,203.57. The return for 1947 was prepared by Gregory and was filed on April 3, 1948. The deficiency notice involving the taxable years was issued under date of March 11, 1949 and refers to a report of examination dated April 26, 1948. The net income as reported by the petitioner and as determined by the respondent for each of the calendar years 1943 through 1947, inclusive, is as follows: Year
Petitioner
Respondent
1943
$2,231.75
$ 7,633.32
1944
1,453.50
4,959.29
1945
1,084.43
12,363.69
1946
3,963.00
14,901.21
1947
5,341.66 *
1,641.69
The amounts of accounts payable at the end of each year which were added to inventories, in the determinations of deficiency, and as shown by petitioner's books, were as follows: As shown
As determined
by books
1943 (Jan. 1)
$ 2,601.90
1943 (Dec. 31)
1,975.58
$ 2,101.01
1944
9,053.93
10,683.12
1945
5,962.58
8,544.89
1946
9,757.24
10,697.19
1947
11,555.29
11,985.51
*36 Opinion We will first consider the contention by the petitioner, as expressed on brief and in his opening statement at trial, that the Commissioner is estopped to assert additional deficiency for the year 1943 based upon additional examination of petitioner's books, in violation of section 3631 of the Internal Revenue Code. That section provides, in substance, against unnecessary examinations and only one inspection of books of account unless the Commissioner notifies the taxpayer in writing that additional inspection is necessary. No such issue was raised, and estoppel was not pleaded, in the petition. Moreover, there is no evidence before us that the Commissioner did not notify the petitioner in writing that additional inspection was necessary. We resolve the point against the petitioner. We next consider the petitioner's contention that all of the deficiencies involved were arbitrary and excessive under the doctrine of Helvering v. Taylor, 293 U.S. 507. We do not find in petitioner's assignments of error in the petition any allegation that the action of the Commissioner was arbitrary; however in the facts upon which the petitioner relies, *37 as recited in the petition, it is alleged that petitioner's inventories were disregarded, and arbitrary, excessive and erroneous sums substituted therefor; also that petitioner's records show that the tax liabilities determined are arbitrary, excessive and erroneous, and in his prayer the petitioner prays, inter alia, that we adjudge that the tax liabilities set forth in the deficiency notice are arbitrary, excessive and erroneous. We will therefore, though in the absence of any definite assignment of error, consider the contention made, upon its merits. It amounts to a contention that the determinations were made without such a full and comprehensive examination of the petitioner's books and records as would have disclosed that his income could be accurately computed therefrom. In substance, the petitioner appears to take the view that it was the duty of the Commissioner to ascertain his income however difficult the task because of the condition of the books and records, and that it was arbitrary for the revenue agent, after inspecting the books sufficiently to convince himself that they were "a pretty ragged, sorry lot of books" and to determine that they were inadequate to reflect *38 net income, to recommend to the petitioner that he get an accountant, and then after such accountant had prepared returns on a net worth basis because he too thought that was the only way to determine the income, to accept in large measure the accountant's net worth statement in the determination of the deficiencies, after checking the records and making adjustments, the general effect of which was to lower petitioner's income tax. We have considered all of the evidence on this and we fail to see, in the circumstances involved, any arbitrary action on the part of the Commissioner. Section 41 of the Internal Revenue Code provides that if the method of accounting employed by the taxpayer does not "clearly reflect the income" the computation shall be made in accordance with such method "as in the opinion of the Commissioner does clearly reflect the income." It is obvious, we think, that the petitioner's records did notclearly reflect the income; for example, they did not show discounts, although cash discounts were taken. Petitioner argues that it would have been possible for the revenue agent to have figured the discounts for himself. So assuming, we do not think *39 that it was arbitrary for the revenue agent to suggest that such task, with a general audit of the books, be done by an accountant for petitioner. Other deficiencies in the books, such as the absence of entries of sales upon days not Sundays (with no explanation or showing that there were no such sales), absence of daily deposits or cash accounts, and lack of records as to farm operations, clearly rendered the petitioner's books such as not clearly to reflect income. In that situation the revenue agent, after an accountant shown to be fully qualified had, because in his opinion it was necessary to do so, worked up a showing of income on a net worth basis, used, in general, such net worth computation. Though the petitioner seeks to give the impression that the revenue agent recommended the accountant and was his friend, no such proof appears. Still later, another set of accountants duly employed and paid by the petitioner recommended that the agent's report, based upon the net worth method of determining the income, be accepted, and the petitioner, in fact twice, agreed to the deficiencies so determined, once signing a paper to that effect, which however, he had the agent return to *40 him. All this seems to us to be not arbitrary action but, if anything, the opposite. We conclude and hold that there is no showing that the deficiencies here involved were the result of arbitrary action by the Commissioner in the use of the net worth method of determining income. We next consider, therefore, whether in so determining income upon the net worth basis the Commissioner erred. The principal contention in this regard has to do with the treatment of inventories. The petitioner had books showing inventories. The Commissioner (aside from other adjustments not placed in issue) in his determination of income under the net worth method used the petitioner's inventories but added amounts which he determined to be the accounts payable. This had been the system used by petitioner's accountant on the theory that there was doubt in his mind about the proper amount of inventories so that he added the current accounts payable on the theory that the goods were fresh and salable. The record, we think, fails to demonstrate error in such method. Though the petitioner testified that he took inventory at cost or market, he also testified that he determined what an article was worth by his *41 own knowledge and put down what it was worth to him, that his inventory was at times during the war years worth more and at times worth less than it cost, and that there was a shortage of goods, which tended to make things more valuable. It is also of record that he had stated to the revenue agent that he had a practice of taking inventory at about 50 per cent of value, that his record of inventories was obsolete, and that the cost would probably run around $40,000 or $50,000 for inventory but that the value was not there. Considering all of the evidence, we can not find that it has been shown error on the part of the Commissioner to increase the inventories as shown on the books by adding thereto the amount of accounts payable. The increases resulting are much less than the possibilities indicated by the petitioner's testimony. However, the amounts of accounts payable so added to inventories by the respondent are different from, and exceed, the amounts which the petitioner upon trial showed to be his accounts payable. The difference in figures has been set forth in the facts and need not be here repeated. The record contains no contradiction of petitioner's figures in that respect. *42 We, therefore, adopt as the proper figures, for addition to inventory, the amounts of the petitioner's accounts payable. The respondent at trial conceded that the exhibits so showing the accounts payable were relevant to the question of correct amount of inventory, and upon brief nowhere suggests that the petitioner's figures on accounts payable are not correct. We therefore approve, in the determination of income on the net worth method, the use of inventories obtained by adding to the inventory figures used by the petitioner the figures shown by the evidence to represent accounts payable as taken from his books. No figure differing from those used in the deficiency notice, as to accounts payable on January 1, 1943 was shown. The petition did not put in issue the opening net worth statement on January 1, 1943. The figures used in the deficiency notice for that date, as to inventory and accounts payable, are approved. The use of the figures, as to accounts payable, proven by the petitioner may affect the amount of net loss carry-back from 1948 to 1947, as to which the respondent admitted a carry-back of $14,064.49 less any amount by which inventory of December 31, 1947, as determined *43 by the Commissioner is decreased. On brief the petitioner refers to bank checks outstanding at the end of each year not set forth in the net worth statement as liabilities. The petition alleges that unpaid bank checks were not deducted from bank balances in figuring net worth. Petitioner agrees that he has failed to prove the amount thereof but suggests that though the items are not large they demonstrate that the net worth statements are unreliable and untrustworthy. In the absence of evidence on the subject, no error on the point is shown. Contention is made that the petitioner possessed on January 1, 1943, at the beginning of the net worth period, $15,000 which had been paid to his wife as fire insurance proceeds; and that the amount was not considered in arriving at net worth. His testimony was that he had "near $15,000" of which about $5,800 finally went into the business. He was asked whether he considered and included that money as a part of the cash on hand and answered "Wasn't." This leaves the evidence in an unsatisfactory condition. It was objected to as not within the issues. We have concluded that no such issue was set up in the petition. Fair trial required that the *44 respondent be not required to meet such a contention. The matter is therefore resolved in favor of the respondent. This leaves for consideration the question of whether the petitioner is liable for the 5 per cent negligence penalties upon the deficiencies. The petitioner urges that deficiencies were due to an honest misunderstanding of the facts or law. It is clear, we think, from the whole record that the penalties for negligence of the petitioner are clearly applicable within section 293 (a) of the Internal Revenue Code. A fair consideration of the record requires the conclusion that at least some part of every deficiency is due to negligence within the statute. The fact that there is a carry-back of a net operating loss from 1948 to 1947 does not prevent application of the penalty for 1947. Manning v. Seeley Tube & Box Co., 338 U.S. 561; C.V.L. Corporation, 17 T.C. - No. 95 (promulgated November 23, 1951). Decision will be entered under Rule 50. Footnotes
*. Net loss.↩