On writ of certiorari (347 U. S. 965) to review a judgment of the United States Court of Claims that where plaintiff *830 sues to recover the amount of interest collected and paid on potential excess profits tax deficiencies for the years 1940 and 1941, plaintiff was entitled to recover.
The judgment of the United States Court of Claims (Supreme Court No. 29) was reversed by the Supreme Court January 31, 1955, in an opinion by Mr. Justice Burton, which affirmed (Supreme Court No. 41) the opinion of the United States Court of Appeals for the Fifth Circuit in the case of Premier Oil Refining Company of Texas v. United States, 209 F. 2d 692; certiorari granted 346 U. S. 987.
The syllabus of the Supreme Court opinion is as follows:
For the years 1940 through 1945, abatements of federal excess profits taxes, through application of § 722 of the Internal Kevenue Code, are not retroactive; and they relieve taxpayers from the payment of interest on deficiencies in such taxes only from the time of the abate-ments, rather than from the original due dates of the taxes abated.
1. This conclusion is supported by a consideration of the statutory scheme as a whole.
2. The interest here involved is attributable to I. R. C., § 292 (a), and ran from the original due date of the tax.
3. I. R. C., §710 (a) (5), added in 1942, permits a taxpayer, seeking relief under § 722, to defer a part of its existing excess profits taxes where its adjusted excess profits net income exceeds 50% of its normal tax net income. This 1942 amendment, by its restrictions, fairly means that, under all other circumstances, the existing taxes were to be paid when due, or be subjected to interest during their delinquency under §292 (a).
4. The denial of interest on refunds is prescribed by I. R. C., § 3771 (g); and equity demands a comparable result in the case of underpayments.
5. The conclusion here reached is supported by the legislative history and administrative interpretation of § 722 and is consistent in principle with Manning v. Seely Tube & Box Co., 338 U. S. 561.
Mr. Justice BurtoN
delivered the opinion of the Court.
The issue in these cases is whether, for the years 1940 through 1945, abatements of federal excess profits taxes, through application of I. R. C., § 722, are retroactive. For the reasons hereafter stated, we hold that they are *831 not and that they relieve taxpayers from the payment of interest on deficiencies in such taxes from the time of the abatement, rather than from the original due dates of the taxes abated.
In No. 29, United States v. Koffers Co., the taxpayer, respondent therein, reported and paid excess profits taxes of $6,512.76 for 1940, and $1,781,288.14 for 1941. In computing these taxes, it used excess profits credits based upon invested capital. In 1943 and 1945, it applied under § 722 for relief from all or part of these taxes, claiming that they were “excessive and discriminatory.” In accordance with the usual administrative practice, the Commissioner determined the amount of the excess profits taxes due without regard to the application for relief under § 722. In doing so, he found it necessary to proceed under I. R. C., §713, using excess profits credits based upon the taxpayer’s income, rather than upon its invested capital. As a result he found that the above taxes, as returned and paid by the taxpayer without reference to § 722, had been understated and that the following deficiencies existed as of their original due dates, March 15,1941, and 1942:

19Í0 19Í1

Excess profits tax under .§§ 710 (a) and 713_ $466, 921. 67 $2,208,019.09
Payments _ 6,512.76 1,781,288.14
Deficiencies- 460,408.91 426,730. 95
The Commissioner computed interest, at 6% on the above deficiencies, amounting to $217,376.07 for 1940, and $230,504.86 for 1941.
After extended investigations and negotiations conducted under authority of § 722, the Commissioner and the taxpayer agreed upon a “constructive average base period net income” which fixed the excess profits credits for the years in question and, as a result, the relief available under § 722. After this agreement was approved by the Excess Profits Tax Council of the Bureau of Internal Revenue, the Commissioner determined that the above-stated deficiencies, with the benefit of § 722, should be reduced to $260,554.39 for 1940, and to $95,749.33 for 1941. The taxpayer consented to the assessment of these deficiencies, with interest as provided by law. Whereupon, the Commissioner issued a formal determination of them and assessed them against the taxpayer. He also assessed the above-stated interest charges, based upon the full amount of the original deficiencies.
*832 The taxpayer paid the deficiencies and interest so assessed but claimed refunds of $94,358.71 for 1940, and $178,784.48 for 1941. Those sums represented the interest on the abatements in its excess profits taxes made under § 722. When the Commissioner disallowed the claims, the taxpayer sued in the Court of Claims to recover their amounts. With one judge dissenting, that court deducted a set-off and rendered judgment in favor of the taxpayer for $270,216.34. 126 Ct. Cl. 847, 117 F. Supp. 181. To resolve the resulting conflict with United States v. Premier Oil Co., 209 F. 2d 692, we granted certiorari, 347 U. S. 965.
In No. 41, Premier Oil Co. v. United States, the taxpayer, petitioner therein, paid the excess profits taxes shown on its original returns in the following amounts: for 1943, $564,167.70 (adjusted to $560,484.84); for 1944, $353,292.15 (adjusted to $313,639.13); and for 1945, $45,679.67. Thereafter, several deductions which the taxpayer had made from its income were disallowed, resulting, in 1948, in the following deficiencies in its payment of its excess profits and income taxes as of their original due dates:
DefioieNcies Without the Application of § 722

In the meantime, the taxpayer had applied for relief under § 722, seeking acceptance of a “constructive average base period net income” of $357,000 for each of the years at issue. The Excess Profits Tax Council approved that figure as a credit in lieu of $93,150.36 for each of the years 1943 and 1944, and of $116,437.95 for 1945. This credit so far reduced the taxpayer’s taxable excess profits as to abate its excess profits tax deficiencies for 1943 and *833 1944 entirely, and that for 1945 to $366.52.[1] Accordingly, the Commissioner’s assessment of the remainder of the taxpayer’s deficiencies in excess profits taxes was for only $366.52. However, as in the Koffers case, sufra, he assessed against the taxpayer the full amount of the interest charges based upon the original deficiencies.
The taxpayer paid the deficiency and interest so assessed but claimed refunds totaling $56,855.41. That sum represented the interest on the abatements in its excess profits taxes made under § 722. When the Commissioner disallowed those claims, the taxpayer brought the instant action to recover their amounts, in the United States District Court for the Northern District of Texas, under 28 U. S. C. § 1346 (a) (1). That court rendered judgment for the taxpayer.[2] 107 F. Supp. 837. The Court of Appeals reversed. 209 F. 2d 692. We granted certiorari to resolve the conflict with United States v. Koppers Co., supra. 347 U. S. 987.[3]
As the underlying issue is the same in each case and for each year, we shall discuss it in relation to the 1940 taxes in the Koff&rs case. There, the taxpayer, under the usual procedure, computed and paid the excess profits tax of $6,512.76 shown on its return for 1940. In due course the Commissioner, without the application of § 722, determined that the payment should have been $466,921.67, and, therefore, that a deficiency of $460,408.91 was due the United States, with interest from March 15, 1941. I. R. C., §§ 53 (a), 56 (a). If the taxpayer had made no application for relief under § 722, there is no doubt that *834 such, interest would have remained due the United States until paid and that, when paid, it would not have been refundable. The same would have been true if the taxpayer’s application for relief under § 722 had been finally denied. The taxpayer contends, however, that, because the Commissioner has abated the taxpayer’s deficiency from $460,408.91 to $260,554.39 under § 722, such reduction is necessarily retroactive to March 15,1941, and that the taxpayer, accordingly, is entitled to a refund of the interest on the sum abated. The Commissioner, on the other hand, contends that the determination under § 722 is not retroactive but is a current abatement effective when made.
Congress could have prescribed either treatment but did not expressly specify either. Our answer is determined from our consideration of the statutory scheme as a whole, the related provisions of the statute, the legislative history of § 722 and the administrative interpretation that has been given the statute.
1. The statutory scheme as a whole
The excess profits tax was a device initiated by Congress, late in 1940, in great part for the quick collection of large sums needed by the Government in a national emergency. Congress sought to obtain those funds from abnormally high corporate profits while such profits were available. To that end, it prescribed computations of unusual profits and required prompt payment of the taxes on them.
From the beginning, the statute also provided, in § 722, a means of subsequent adjustment of the tax in special instances where the normal computation of the tax was found to result in inequity. The adjustment could be made only after administrative action and, pending its consideration, it did not eliminate the tax return or the tax payment otherwise required. Until 1942, it did not permit even the postponement of the Íiayment of any part of the standard tax. Indeed, the uil payment of that tax soon was made an express condition of the application for adjustment. I. R. C., §722 (d). In 1943, Congress stated that if overpay-ments for either of the taxable years 1940 or 1941 were found to be attributable to § 722, no interest on such overpayments was to be paid the taxpayer. At least to that extent, Congress expressly recognized that the funds paid as excess profits taxes, when due and without the benefit of § 722, were funds owed to and usable by the Government.
*835 The signifiance of this statutory scheme further appears when it is applied to the instant case. If the instant taxpayer had paid its required tax in 1941, the Government would nave received an additional $460,-408.91 at that time. Accordingly, it would have had the use of that money, without charge, during the crucial war years. Correspondingly, the taxpayer would have been without that money during the same period. Instead, the taxpayer, in fact, retained the funds for its own use and now contends that it need not compensate the Government for such use of a substantial part of it.
While in the instant case the taxpayer did not underpay any amount actually shown on its return, as contemplated by I. E. C., § 294 (a), it understated its tax and thus withheld the amount in question. The detriment to the Government and benefit to the taxpayer was the same — the use of $460,408.91 for eight years. The above distinction, emphasized by the taxpayer, may have helped it in initiating its application for relief under § 722 (d) because it could establish that, at least, it had paid “the tax shown on its return.” The distinction, however, supplies no ground for different results once the deficiencies have been determined. We find no implication that a self-serving error in the understatement of its tax on its tax return entitles the taxpayer to a greater ultimate tax advantage than does a self-serving error of the same size in the underpayment of the same tax. A fortiori we find nothing to justify a greater tax advantage to any taxpayer that underpays its correct tax, over one that pays such tax in full when due.
2. The i/nterest here in controversy is attributable to I. B. O., § m (a)
The interest here in controversy was due under § 292 (a) from March 15, 1941, until paid. Accordingly, to obtain a refund of it, the taxpayer must sustain the proposition that the tax relief granted under § 722 is necessarily retroactive, extinguishing the deficiency as of the original due date of the tax and thus eliminating the interest charges for the corresponding period. To that end, the taxpayer emphasizes the statement in § 722 (a) that, as a condition of securing the application of § 722, a taxpayer must establish that the usual procedure “results in an excessive and discriminatory tax” and also must establish “what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income.” Once the taxpayer has done that, “the tax shall be determined by using such *836 constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter.” Standing alone, this directive language is elastic. It can be read consistently either with the interpretation that the new computation replaces and abates the old one currently, when the new one is determined and assessed, or that it retroactively replaces the old tax from its original due date. It leaves the issue open for disposition by the effect of other clauses relating more specifically to the issue. For the reasons hereafter stated, we read it as looking forward, rather than backward.
3. 7. B. O., § 710 (a) (5), 'permits a taxpayer, seeking relief wider § /##, to defer a fart of its existing excess profits teases where its adjusted excess profits net income exceeds 50% of its normal tax net income
In 1942, Congress added § 710 (a) (5), conditionally authorizing partial deferment of the tax in cases where a taxpayer maimed benefits under § 722. The condition was that the taxpayer’s “adjusted excess profits net income (computed without reference to section 722) ” must exceed 50% of the taxpayer’s normal tax net income for the year. Even then, deferment was limited to 33% of the benefit claimed under § 722. If a taxpayer, without this amendment, could have successfully deferred payment and avoided interest charges by following the course taken in the instant cases, it could, by understatement of its tax, have deferred, without incurring interest charges, the payment of a corresponding part of its tax pending relief. If so, there would have been little need for § 710 (a) (5). The 1942 amendment, by its restrictions, fairly meant that, under all other circumstances, the existing taxes were to be paid when due, or be subjected to interest during their delinquency under §292 (a).
4. The denied of interest on refunds is prescribed by I.B. G., § 3771 (g)
Although § 3771 (g) was not enacted until 1943, it was then made applicable to taxable years before, as well as after, January 1,1942. It denied all interest on refunds attributable to § 722 where the refunds related to the taxable years 1940 or 1941. It also denied interest on refunds relating to taxable years beginning after January 1, 1942, but limited such denials to the first year after the filing of an application for relief under § 722, or to periods prior to September 16, 1945 (two *837 years after the effective date of the amendment), whichever was the later.
In cases where the Government has authorized refunds of excess profits taxes overpaid to it by reason of the abatement of taxes attributable to § 722, § 3771 (g) expressly precludes the payment of interest by the Government upon the amounts abated. This treats the Government as entitled to the use of the abated amounts between the time of their overpayment and that of their abatement. Equity demands a comparable result in the case of underpayments. Where unpaid taxes are abated by reason of § 722, the taxpayer then receives a release from its existing obligation to pay the amount abated. However, the Government having been entitled, up to that time, to collect and use the sum abated, the Government should receive interest, on the abated sum, for the period during which the Government was entitled to have its use. This is the natural counterpart of the Government’s freedom from paying interest on refunded overpayments.
5. The legislative history of § 7M
The excess profits tax was initiated in 1940. 54 Stat. 975 et seg. It provided for prompt payment of large taxes computed on income reflecting unusual profits. Computation of the tax on the basis of the taxpayer’s prior income or invested capital was prescribed in §8 713 and 714. A standardized treatment of abnormalities was provided in § 721. In addition, § 722 authorized the Commissioner “to make such adjustments as may be necessary to adjust abnormalities affecting income or capital.” 54 Stat. 986. The procedure under .§ 722 was formalized by the Excess Profits Tax Amendments of 1941, 55 Stat. 23-25, and put in its final form by the Bevenue Act of 1942, 56 Stat. 914-917, as amended, 57 Stat. 601-602. The technical and discretionary nature of the adjustment was emphasized by the provision that the determination of most computations under § 722 was reviewable only by a special division of the Tax Court constituted for the occasion and by no other court or agency. 55 Stat. 26, as amended, 56 Stat. 917, 59 Stat. 295, 673, 26 U. S. C. § 732. A taxpayer never was permitted to file a return of its own under § 722. S. Rep. No. 75, 77th Cong., 1st Sess. 13; H. B. Rep. No. 146, 77th Cong., 1st Sess. 13.
The statute has been interpreted as authorizing a procedure that is in the nature of a claim for a refund preceded by long investigations of complicated special *838 circumstances, and followed by extended negotiations between the Commissioner and taxpayer to develop a mutually satisfactory “constructive average base period net income.” This interpretation leaves the usual procedure under § 710 et seq. complete in itself but subject, upon application, to ultimate adjustment in instances accepted by the Commissioner under § 722. We find no statement of a purpose that § 722 shall relieve taxpayers from penalties or interest charges due either to their defaults in paying, or their errors in computing, their taxes. On the contrary, it has been suggested that Congress considered relief under § 722 to be in the nature of a favor and as not relieving the taxpayer of its duty to pay the original tax when due.
The regulations do not deal specifically with the issue before us but, from their beginning, in Treasury Regulations 109, they have been consistent with the interpretation given the Act by the Government. See .§ 30.722-5, as added by T. D. 5264,1943 Cum. Bull. 761, as amended, T. D. 5393, 1944 Cum. Bull. 415. In addition to the practice of the Commissioner in the instant cases, there is in the record of the Premier Oil Go. case an undisputed affidavit by a Treasury Department reviewer to the effect that the policy followed was the administrative policy of the Bureau:
“It is the policy of the Bureau of Internal Revenue in those cases where all or any part of a tax deficiency has been extinguished by application of the relief provisions of Section 722 of the Internal Revenue Code not to assess the extinguished portion of such deficiency. However, interest has been computed and assessed on the extinguished portion of the deficiency from the due date of the return to the thirtieth day after the agreement, Form 874, is filed or date of assessment, whichever is the earlier.” [Emphasis supplied.]
While Manning v. Seeley Tube & Box Co., 338 U. S. 561, relates to the carry-back provisions of the Internal Revenue Code, it is thoroughly consistent in principle with the above discussion. There the Court upheld the collection of interest on a deficiency which later was extinguished by carrying back a loss which occurred in a subsequent year. It treated the carry-back as a current adjustment of the tax previously determined, characterizing it as an “abatement” at 565. It recognized I. R. C., § 3771 (e), as a help to the interpretation of the statute, much as we recognize I. R. C., § 3771 (g), as a help here. See 567-568. The Court also there announced that “In the absence of a clear legislative expression to the con *839 trary, the question of who properly should possess the right of use of the money owed the Government for the period it is owed must be answered in favor of the Government.” Id., at 566.
While the deficiency for 1940 in the amount of $460,408.91 was properly determined without reference to § 722 and treated as a deficiency for that year by the Commissioner, it was not separately assessed as such. This was not necessary because, at the time of its determination and before its assessment, it was abated to $260,554.39. The latter sum, with interest in the amount of $217,376.07 computed on the whole deficiency of $460,-408.91, was correctly and adequately assessed and paid.
For the foregoing reasons, we conclude that the Government, in each case, is entitled to retain the interest now in controversy. Therefore, in No. 29, the judgment of the Court of Claims is reversed and, in No. 41, the judgment of the Court of Appeals is affirmed.
Mr. Justice Eeed and Mr. Justice Douglas dissent.

 Abatement of Excess Profits Tax Deficiencies under § 722

194s 19U 1946

Deficiencies without application of § 722_ $78,359.80 $56,629.92 $190,785.32
(Decreases) under 5 722.-. (175,307.78) (175,174.49) (190,418.80)
Resulting (credits) and deficiency_ (96,947.98) (119,644.57) 366.62
By reducing that part of the taxpayer’s income that was subject to excess profits taxes, this application of § 722 automatically left more of the taxpayer’s income subject to the normal tax and surtax. Those increases in the taxpayer’s income taxes and their consequences are not before us.

 The original judgment for $56,855.41 was modified to $52,292.40 to reflect several adjustments, including the deduction of $49.72, representing interest on the unabated deficiency of $366.52 upon which the taxpayer conceded that interest was chargeable.

 The grant was limited to the following question stated in the petition:
“Where a deficiency in excess profits tax, based on the income and credits as shown in the taxpayer’s return, would have existed except for the subsequent application of Section 722 of the Internal Revenue Code, is the taxpayer liable for interest on the amount of such deficiency (hereinafter called the ‘potential deficiency’) which would have existed had it not been extinguished by the application of Section 722 7” 347 U. S., at 988.