United States Court of Appeals,

Fifth Circuit.

No. 92–1122

Summary Calendar.

Michael B. SUFFNESS, and Dorit R. Suffness, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

Oct. 8, 1992.

Appeal from the United States District Court For the Northern District of Texas.

Before KING and WIENER, Circuit Judges.[*]*

WIENER, Circuit Judge.

aintiffs–Appellants Michael B. and Dorit R. Suffness, husband and wife (Taxpayers) appeal the adverse judgment of the district court, rendered following the bench trial of Taxpayers' income tax refund suit on stipulated facts. The sole issue before the court was whether Taxpayers owed interest on the amount of additional tax remitted by Taxpayers after they failed timely to reinvest, in property of like kind, the proceeds of the involuntary conversion of their corporate stock certified by the Federal Communications Commission (FCC) to be "broadcasting property" and thus qualified for deferral of recognition of gain. Agreeing fully with the district court's judgment denying Taxpayers' claim for a refund of the disputed interest, which the government had collected by offset against Taxpayers' subsequent income tax refund for 1988, we affirm.

I

FACTS AND PROCEEDINGS

As stipulated to the district court, Taxpayers filed their United States Income Tax Return for

---

[*]This case is being decided by quorum. See 28 U.S.C. § 46(d).

calendar year 1986 (the return) on or about May 28, 1987.[1]  In the return, Taxpayers fully reported the involuntary conversion sale of twenty-five shares of the common stock of Connection Communications Corporation (CCC), duly certified by the FCC as "broadcasting property" for purposes of deferred recognition of gain under §§ 1071 and 1033 of the Internal Revenue Code of 1954 (IRC).[2]  On the return, Taxpayers properly elected to defer recognition of the gain from the involuntary conversion of their stock in CCC.  But as Taxpayers did not, within two years after the year of the involuntary conversion, reinvest the proceeds from their CCC stock in property similar or related in service or use, they were required to and did file an amended 1986 return,[3] timely paying therewith the correct amount of additional tax—$15,072—on the gain from the involuntary disposition of the CCC stock in that year.  Taxpayers did not, however, remit interest on the additional tax.  The undisputed amount of such interest, calculated from the due date of the 1986 return (April 15, 1987) through the date tax was paid (March 13, 1989) is $3,166.95.

On May 22, 1989, the government collected the $3,166.95 interest by offsetting that amount from Taxpayers' 1988 income tax refund, unrelated to the subject transaction.  Taxpayers timely filed a claim for refund which the government denied.  Taxpayers then filed the instant refund suit in federal district court, and the government answered.  The parties stipulated the facts, after which each moved for Judgment on the Pleadings or Summary Judgment.  The district court denied Taxpayers' motions and granted the motions of the government, 788 F.Supp. 304 (N.D.Tex.1992), dismissing the Taxpayers' suit.  They appealed timely to this court.

II

ANALYSIS

---

[1]The Return was due April 15, 1987.  As no mention is made of the May 28th filing having been delinquent, we assume that it was filed late pursuant to a valid extension.

[2]26 U.S.C. §§ 1071, 1033.

[3]Treas.Reg. § 1.1033(a)–2(c)(2).

When the sale or exchange of radio broadcasting property, including stock in a corporation, is certified by the FCC as necessary or appropriate to effectuate FCC policy with respect to radio station ownership,[4] the transaction is deemed to be an involuntary conversion for tax purposes.[5] A taxpayer whose certified broadcasting property is thus involuntarily converted has the option either to (1) report the gain realized and pay tax thereon currently, or (2) defer recognition of such gain and reinvest the proceeds in property "similar or related in service or use to the property so converted" within two years after the close of the taxable year in which gain was realized.[6] If a taxpayer elects deferral but thereafter fails to make a qualifying investment in property of like kind within that two-year period, he or she must recognize the gain retroactively to the year in which it was realized.[7]

Neither the IRC section covering FCC certified broadcasting property[8] nor the section covering deferral of recognition of gain realized on involuntary conversion of qualified property[9] expressly mention interest in connection with the additional tax that must be remitted when the proceeds of conversion are not timely reinvested in qualified property. Nevertheless, the IRC does contain a section providing for the payment of interest on all taxes paid subsequent to the date due, irrespective of the reason for the delayed, late, or delinquent payment.[10] That provision contains no exception for a situation in which the tax that is being paid was previously deferred pending possible reinvestment of the proceeds of involuntary conversion.

The principal thrust of the argument in Taxpayers' brief to this court is that, as the IRC section

---

[4]IRC § 1071.

[5]IRC § 1033.

[6]IRC § 1033(a)(2)(A).

[7]Treas.Reg. § 1.1033(a)–2(c)(2).

[8]IRC § 1071.

[9]IRC § 1033.

[10]IRC § 6601.

and Treasury Regulation covering subsequent payment of previously deferred tax on gain realized in an involuntary conversion situation "are silent as to the imposition of interest if reinvestment is not made during the two-year deferral period," the general provisions of the IRC regarding imposition of interest on taxes not paid on or before the last day prescribed for their payment is inapplicable. We find such logic fallacious. The IRC is, after all, a code; and any recognized method of code interpretation supports precisely the reverse logic: As the general provision imposes interest on all late tax payments, only an express provision in derogation of the general rule could exempt from interest some particular type of tax when paid subsequent to its normal due date. In other words, the silence of the general provision does not exempt the transaction authorized by the particular provision; to the contrary, absent an express exception, the general provision always applies. Thus, the Taxpayers' criticism of the district court's ruling is misplaced when they insist that simply because the general IRC provision does not expressly impose interest on additional tax paid following the specifically authorized deferral period for reinvestment of the proceeds of involuntary conversion, the interest rule contained in the general provision cannot apply.

We recognize that logic and reason are not always ingredients of the IRC, Treasury Regulations, Revenue Rulings—or even tax jurisprudence—but they are in the instant situation. Options to defer recognition of gain by reinvesting the proceeds realized therefrom are exceptions to the basic rule requiring recognition of gain in the year realized. As such, they are acts of grace, of which the one here at issue is a specific example.[11] It embodies the acknowledgment that forced divestment of broadcasting property to implement the FCC's policy on station ownership could work a severe tax and cash flow hardship on the divesting taxpayer.[12] In that regard, involuntary conversion of broadcasting property is not unlike the forced sale of immovable (real) property when a sovereign exercises the power of expropriation or eminent domain.

---

[11]IRC § 1071.

[12]*See, e.g., Filippini v. United States,* 318 F.2d 841 (9th Cir.1963).

Here, as in other involuntary conversion situations, the option either to defer gain or recognize it currently rests entirely with the taxpayer. If the taxpayer elects to defer, he or she does so subject to the express condition of making a timely reinvestment in qualifying property—in which case recognition of gain is deferred until the replacement property is eventually sold or exchanged. Failure timely to reinvest in qualified property, however, automatically revokes the election retroactively, obligating the taxpayer who has elected deferral to recognize the gain as though it occurred in the year of conversion. Thus, the tax that was due with the return for the year of the involuntary conversion is again *due* thereon, albeit such tax is not *delinquent.* Obviously, the condition of reinvestment is a resolutory condition or condition subsequent, the eventual failure of which dissolves the right ab initio. The legal effect of such a retroactive dissolution on the right thus dissolved—here, tentative deferral of gain recognition—is that such right is deemed never to have existed.

Equally fallacious is the other thrust of Taxpayers' argument: that the phrase "the last date prescribed for payment" in the general interest provision[13] should mean the date on which the tax return is due for the year in which the two-year reinvestment period *expires,* not the due date of the return for the year in which the involuntary conversion occurred. Taxpayers continue to insist that their interpretation is proper when read in context of general IRC provisions on due dates for filing and payment.[14] We see no more validity in this position than we did in Taxpayers' effort to reverse the roles of the IRC's general and particular interest provisions. Indeed, the IRC provisions that Taxpayers would have us read *in pari materiae* with the general interest provision contain express parenthetical caveats which state that due dates are determined without regard for any extension of time for paying the tax.[15] If it is nothing else, the deferral of recognition of gain on involuntary conversion is a two-year extension of time within which to pay the gains tax on the transaction in question.

[13]IRC § 6601(a).

[14]IRC §§ 6072(a), 6151(a).

[15]*See, e.g.,* IRC § 6151(c).

Likewise, Taxpayers' attempt to analogize deferral of recognition of gain in involuntary conversion situations to such deferral on the sale of one's principal residence is an example of the proverbial fallacy of comparing apples and oranges. The sale of the home is not an involuntary transaction forced upon the taxpayer as is an FCC divestiture or a taking in eminent domain; it is a voluntary act of the homeowner. Moreover, the relief provided for the seller of his or her principal residence is grounded in Congress's recognition that while, for most taxpayers, the home is the most valuable asset, it is not a business or investment asset and any gain almost always results purely from inflation. Moreover, principal residences occupy a unique and elevated societal pedestal in this country, and collectively play an equally unique and significant role in the national economy—not to mention the influential home builders and lenders lobbies which favor and urge such special tax treatment. To a significant degree, the tax treatment of the principal residence is sui generis and thus not analogous to the tax treatment of any other assets including broadcasting property.

To see clearly the error of Taxpayers' position in the instant case—that no interest is due on the additional tax when it is remitted two years after it was otherwise payable—we need only observe that, in granting some specially situated taxpayers the option to defer recognition of gain on involuntary conversion, Congress intended to grant relief, not a windfall. Were we to hold that no interest is due simply because the specific section of the IRC which provides the deferred recognition option for broadcasting property fails to reiterate the general rule imposing interest on tax which is remitted after it would otherwise have been payable, every taxpayer whose broadcasting property is involuntarily converted would, in effect, be entitled to a two-year, interest-free loan from the government in an amount equal to the deferred gains tax. That would even hold true for taxpayers who, from the outset, have no intention whatsoever of reinvesting the proceeds of the conversion in qualifying property. If that were the law, who would be foolhardy enough *not* to elect deferral and use the government's money interest-free for two years?

Stated another way, taxpayers who elect deferral would have the free investment use of the

government's tax money for two years while the government waits to see if those taxpayers make qualifying investments. That would be a classic taxpayer windfall, not a detriment. For, at least in theory, a taxpayer electing deferral should be able to realize the same investment return on the use of the government's tax money during the deferral period as such taxpayer would eventually be required to pay to the government as interest should no qualifying reinvestment be timely made.

Refreshingly, t he tax law in the instant case is clear, logical and reasonable: If deferral is elected but reinvestment is not timely made, the gain realized on the sale or exchange in question is recognized, ab initio, for the year in which it occurred—here, 1986. Under such circumstances, the resulting gains tax of $15,072 on Taxpayers' sale of CCC stock was due and payable retroactively as of April 15, 1987, the date that Taxpayers' 1986 return was due. To the extent such tax was not paid on that date, it bears interest as prescribed in the IRC,[16] just like any other tax not paid by the date the return is due for the year in which the taxable event occurs.

As the government notes, interest is not a penalty. Hence the fact that Taxpayers were lawful in delaying the payment of their gains tax pending the outcome of efforts to reinvest in property of like kind is wholly irrelevant to the issue of interest.[17]

The undisputed amount of interest on the additional tax, calculated from the original due date of the return until remitted by Taxpayers, is $3,166.96. That is precisely the amount that the IRS collected by offset against Taxpayers' 1988 income tax refund. For the reasons set forth above, it is clear beyond peradventure that such interest was owed by the Taxpayers.

---

[16]IRC § 6601(a).

[17]*See, e.g., Manning v. Seeley Tube & Box Co.,* 338 U.S. 561, 563–66, 70 S.Ct. 386, 387–89, 94 L.Ed. 346 (1950); *United States v. Childs,* 266 U.S. 304, 309–10, 45 S.Ct. 110, 111, 69 L.Ed. 299 (1924); *United States v. Premier Oil Refining Co. of Texas,* 209 F.2d 692, 697–98 (5th Cir.1954); *Bowman v. United States,* 824 F.2d 528, 531 (6th Cir.1987); *Grauvogel v. Commissioner,* 768 F.2d 1087, 1090 (9th Cir.1985).

## III

## CONCLUSION

Unlike many federal income tax cases, the instant litigation involves nothing Byzantine or arcane.  The facts are clear;  the law is clear;  the ruling by the district court is clear—and eminently correct.

AFFIRMED at Appellants' cost.