## STOW MFG. CO., Inc. v. COMMISSIONER OF INTERNAL REVENUE.

No. 248, Docket 21830.

United States Court of Appeals Second Circuit.

Argued June 12, 1951.

Decided July 17, 1951.

724

Carbery O'Shea, New York City, George
G. Coughlin, Binghamton, N. Y., Donovan,
Leisure, Newton, Lumbard & Irvine, New
York City, Harrison, Coughlin, Dermody &
Ingalls, Binghamton, N. Y., of counsel, for
petitioner.

Charles Oliphant, Theron L. Caudle,
Washington, D. C., Irving I. Axelrad,
Washington, D. C., Ellis N. Slack, Sp. Asst.
to the Atty. Gen., for respondent.

Before SWAN, Chief Judge, and AU-
GUSTUS N. HAND and L. HAND, Cir-
cuit Judges.

L. HAND, Circuit Judge.

This appeal (petition to review) chal-
lenges the validity of the assessment of a
deficiency in the taxpayer's excess profits
tax for the year 1942. The taxpayer is a
corporation which makes "flexible shaft-
ing," and which in 1942 had contracts with
the United States Navy to supply it with
that article. During the year 1943 it en-
tered into "renegotiation" with the Navy
under the Renegotiation Act [1] for the re-
payment of a part of what it had received
from the Navy under the terms of its con-
tracts. The negotiations ended in a con-
tract between it and the Secretary of the
Navy on June 1, 1943, in which it was
agreed that the taxpayer had received ex-
cessive profits to the amount of $350,000,
but as the revenue agent in charge at Buf-
falo allowed a credit of $280,000 as the
taxes properly apportioned to the excess,
the Secretary "allowed" it as a credit
against said $350,000, leaving a net debit of
$70,000 which the company paid. The re-
negotiation contract declared that it was to
be "a final conclusive determination of the
excessive profits for all fiscal periods of
the Contractor up to and including Decem-
ber 31, 1942, and * * * full discharge
of all liability. * * * to refund or re-
pay * * * excessive profits" and that
it "shall not be modified by any officer
* * * of the United States" except for
reasons not here relevant. Upon examina-
tion of the corporation's tax return for
1942 the Commissioner of Internal Revenue
decided that the credit allowed was too
large by $27,000 and assessed that sum as
a deficiency for the year 1942. The tax-
payer does not challenge the correctness of
the tax as finally assessed; but it relies up-
on the renegotiation contract as a final and
definitive liquidation, not only of the gross
amount of excess profits, but of credits to
which it was entitled; it asserts that the
Treasury had no power to assess it for a
tax deficiency, based upon a smaller credit.
The Commissioner does not question the
finality of the amount of excess profits
agreed upon between the Company and the
Secretary, but he does challenge the amount
of credit deducted in reaching the balance
due. He says that the credit in such cases
is only provisionally liquidated, and that it
is to be finally computed like any other tax
liability. This position the Tax Court af-
firmed in banc, and the taxpayer appealed.
The parties are in accord as to the figures
involved.

We agree that it was the purpose
of the Renegotiation Act to provide a sum-
mary procedure by which a contractor, who
was compelled to repay as excess profits
part of what he had received under the
terms of his contract, may set off against
that amount such part of the taxes as had
been levied upon the excess. Moreover,
the Commissioner agrees that the taxpayer
is not obliged to pay the gross excess
profits "eliminated" and sue to recover the
tax he has paid as an overpayment. Not
only is that no more than obvious justice,

1. § 1191, Title 50 War Appendix, U.S.C.A.

and presumably serves to promote speedy settlements; and in any case the statute is peremptory. It seems to us in entire accord with the purpose of the statute that the tax credit should be regarded as fixed only provisionally and tentatively, leaving to both sides the opportunity to correct any errors that may creep into the inevitably summary negotiations of the settlement. It was unlikely that a later examination would disclose that the amount actually due from either side would be seriously crippling; yet it was by no means unlikely that the *ad hoc* liquidation might turn out to be wrong. That was not true as to repayment of excess profits: first, the secretary of the department concerned would be familiar with all the circumstances of the work performed; second, the determination of how much of the contract price was "excess profits" was in any event a subject matter not really justiciable at all, unlike the question as to what credits were properly "allowable" upon them when fixed. Therefore it is reasonable to suppose that Congress may have meant the contracts to be conclusive as to excess profits, but not conclusive as to "allowable credits." Be that as it may, it is indubitable that, certainly as to contractors, Congress did make just that distinction.

Section 403(c)(3) of the Renegotiation Act directed the renegotiating officer to "allow" the contractor a "credit" for taxes "as provided in section 3806" of the Internal Revenue Code; a section which had three "subsections." Subsection (a)(1) provided that when in renegotiation a part of what the taxpayer received under his contract shall be "eliminated" and he has been required to pay it back, that part of the "contract * * * price" shall be "reduced by the amount * * * eliminated." Subsection (b)(1) gave a "credit" against so much of the excess profits as are "eliminated," consisting of "the amount by which the tax * * * is decreased" by the elimination. It might well be, if this somewhat obscure language were all, that once the amount of the tax had been "decreased by reason of" eliminating part of the excess profits, that ended the matter. However, subsection (c) precludes such an interpretation of subsections (a)(1) and (b)(1). It consists of two sentences, of which the first declares that, once a renegotiation credit has been "allowed" to a contractor, it shall be the final allowance of any "credit" to be allowed against the repayment of excess profits for that particular year. That sentence, if taken alone, might be thought to bar all reconsideration of the credit "allowed" though it had been too small. Be that as it may, the second sentence of subsection (c) shows that a renegotiation contract does not bar the contractor from showing that the credit "allowed" was less than that "allowable," or from treating the difference as an overpayment, to be recovered as such. Thus although the contractor must pay the balance fixed in the renegotiation contract, he nevertheless retains his remedy to obtain the repayment of that part of the excess profit which was denied him because of the too low credit allowed. Against him at any rate the renegotiation settlement is not a final liquidation of taxes, but only provisional and tentative. So far, the statute conforms aptly with the purpose of Congress to effect speedy settlements, and yet not to cut off the rights of contractors who may be willing to cooperate in that aim. The amount of the "excess" they must agree to irrevocably; the credit for taxes are not irrevocably concluded.

To this the taxpayer at bar answers that § 403(c)(4) declares that "Any such agreement"—that is, any agreement "for the elimination of excessive profits and for the discharge of any liability for excessive profits"—"shall be final and conclusive according to its terms", and that it "shall not be annulled, modified, set aside, or disregarded in any suit, action, or proceeding." The "liability for excessive profits" does not, it says, mean the minuend of an equation of which the credit for taxes is the subtrahend; it means the difference—the sum that the contractor must pay. Section 403(c)(3) is thought to give plausibility to this argument by saying that "In determining the amount of any excessive profits to be eliminated hereinunder the Secretary shall allow" credit for taxes, and by making immutable such contracts. But the credit

he must allow is that "provided in section 3806," and the credit is to be fixed therefore under subsection (c) of that section and certainly the renegotiation is not immutable as to the contractor. The only escape from construing the finality of the contract with a similar condition, when the credit "allowed" is more than that "allowable," is by the following argument. Although Congress has provided for contractor's recovery when the "allowable" credits were less than those "allowed," concededly it has not granted in terms a correlative privilege to the Treasury to treat as a deficiency so much of the taxes "allowed" as were not "allowable." That choice must have been deliberate: *expressio unius, exclusio alterius*. So far as this argument has cogency, it depends upon the hypothesis that without the second sentence of subsection (c) neither the contractor nor the Treasury would have had any means of correcting the error. So far as concerns the contractor, it is true that as a taxpayer he would have had an action[2] to recover his payment of any taxes which were "illegally assessed or collected * * * [or] unjustly assessed * * * or in any manner wrongfully collected." However, the taxes in question were not illegally assessed or unjustly assessed or wrongfully collected; true, it has turned out that by cutting down the income on which they were computed, it would be unjust and illegal to collect them; but §§ 3770 and 3772 do not, at least literally, apply to the contractor's situation. Certainly the second sentence of subsection (c) was at least highly desirable in order to make the remedy clear. The Treasury on the other hand needed no similar added remedy. Section 3760 of the Internal Revenue Code[3] provides for final "closing agreements" "relating to the liability * * * in respect of any internal revenue tax"; but such agreements must be approved by at least an Assistant Secretary of the Treasury. No one pretends that there was any such agreement in the case at bar; the taxpayer rests its case, as we have already said, upon the proposition that none was necessary because the renegotiation contract finally fixed the "balance" due, and that its finality was not, as we think, confined to the excess profits which must be returned, leaving to the usual procedure the final liquidation of the "credit" "allowable" upon the income as revised. Since therefore the renegotiation contract did not impair any of the means at the disposal of the Treasury for correcting too large a "credit," the inference, inherently feeble, is shown to be baseless that the failure to give an added remedy to the Treasury indicated an intention to relieve mistakes only when they favored the taxpayer.

Order affirmed.

2. §§ 3770 (a) (1) and 3772 (a) (1), Title 26, U.S.C.A.

3. § 3760, Title 26, U.S.C.A.