**STANDARD OIL COMPANY (NEW JERSEY), Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

United States District Court
S. D. New York.

Dec. 23, 1963.

Davis, Polk, Wardwell, Sunderland, & Kiendl, New York City, for Standard Oil Co. of N. J.

Robert M. Morgenthau, U. S. Atty., S.D.N.Y., New York City, for United States.

RYAN, Chief Judge.

Defendant moves for summary judgment in this suit filed by the Standard Oil Company (New Jersey) for refund and recovery of $2,181,489.88, representing interest paid computed on consolidated excess profits taxes for the years 1943 and 1944, cancelled by an excess profit credit.

On the audit of the consolidated excess profits tax returns filed by Standard Oil and its affiliated companies for 1943 and 1944, it was determined by the Commissioner that Standard Oil's excess profits tax deficiencies for these years were extinguished by an excess profits tax credit carryback from 1945. It was also ruled, however, that since this cancellation of the deficiencies in excess profits tax was effected by operation of a credit carryback, it did not relieve Standard Oil from the obligation to pay interest on these deficiencies for the period prior to cancellation. Interest on these "potential deficiencies" for the years 1943 and 1944 was assessed. See Manning v. Seeley Tube & Box Co., 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346 (1950).[1]

Standard Oil maintains that deficiencies in excess profits tax for the years 1943 and 1944 were cancelled not by a credit carryback from the year 1945 but rather by excess profits credit carryovers from the years 1941 and 1942, thus precluding the arising of any potential deficiency. This contention is based on taxpayer's claim that it had sustained certain "war losses" in the year 1941, and that although it had elected not to claim such "war losses" in computing its 1941 normal tax net income under Chapter 1 of the Internal Revenue Code of 1939 for income tax purposes, it could claim such "war losses" in computing its 1941 normal tax net income under Subchapter E of Chapter 2 of the 1939 Code for excess profits tax purposes. Computed thus, Standard Oil contends that it had a sufficiently large excess profits tax credit carryover from the year 1941 to offset the excess profits tax liability for 1943 and 1944.

The Commissioner, on the other hand, takes the position that Standard Oil could claim "war losses" in computing normal tax net income for excess profits tax purposes only to the extent that it had claimed such "war losses" in computing normal tax net income for income tax purposes. Since no part of the war losses now asserted were claimed for income tax purposes for 1941, the Government contends that they may not now be claimed as war losses for excess profits tax purposes for that year. The essence of the argument of the Government is that under the statute taxpayer was required to elect whether it would take the war loss deduction from income tax and that having decided not to do so, it is now entirely barred from applying this as a deduction to excess profits tax computations.

Taxpayer's argument is that this deduction for war losses was required under the statute to be allowed as a matter of law and that its failure to take it did not and should not operate to deprive it of the benefits flowing from these war losses. This is so, Standard Oil argues, because the Commissioner's failure to allow this as a loss sustained on the last applicable date under the statute constituted a mistake of law which should now be rectified by permitting its deduction against excess profits income.[2]

It is a fact that Standard Oil, on March 14, 1942, filed with the Collector

---

1. A suit by Standard Oil to enjoin the collection of the assessed interest was dismissed by this Court for lack of jurisdiction (D.C., 139 F.Supp. 690 (1956)) and affirmed by the Court of Appeals (Standard Oil v. McMahon, etc., 2 Cir., 244 F.2d 11 (1957)). Standard Oil thereafter paid the assessments, filed claims for refund to recover the amounts paid and upon the disallowance of the refund claims, commenced the instant suit for refund of the interest paid plus statutory interest.

2. Note: Although the amount of war losses claimed by plaintiff is disputed by the Government, there will be no need to determine it if defendant is correct in saying that plaintiff may not as a matter of law deduct any amount.

of Internal Revenue a tentative federal income tax return for the year 1941 disclosing a total tax of $2,366,608.00; and that on June 13, 1942, Standard Oil filed its final income tax return for the year 1941, disclosing therein a total tax due of $2,191,177.31.

It also appears undisputed that Standard Oil Company of New Jersey (hereinafter referred to as "Esso") is a wholly owned subsidiary of Standard Oil; that for the year 1941, Esso filed its income tax return on a separate return basis but joined with its parent corporation Standard Oil, in filing a consolidated excess profits tax return for such year; and that Esso's tentative and final income tax returns for 1941 were filed on or about the same dates as its parent's returns and showed a total tax due of $8,303,184.00 on the tentative return and $8,296,778.89 on its final return.

The final consolidated excess profits tax returns filed by Standard Oil on behalf of itself and its affiliated companies including Esso, showed no excess profits tax liability for the year 1941. None of these returns claimed war loss deductions simply because the amendment to the statute allowing them had not yet been passed.[3] On December 15, 1942 (following the enactment of the amendment to Section 13 in October, 1942) Esso filed an amended income tax return for the year 1941 claiming as a deduction war losses sustained in 1941 in the amount of $6,801,094.50. A revision of that figure was allowed as a deduction in computing Esso's normal tax net income for 1941 for both income and consolidated excess profits tax purposes. Subsequently and in 1944, Standard Oil, on behalf of itself and its affiliated companies (Esso included), filed a consolidated excess profits tax return for the year 1943, claiming an excess profits credit carryover from 1941 based in part on alleged "war losses" of

$50,000,000. suffered in 1941, no part of which included the war loss of $6,801,094.50 which Standard Oil had claimed when computing its 1941 normal tax net income. This claimed credit carryover from 1941 eliminated according to this computation, any excess profits tax liability for 1943. In 1945, Standard Oil on behalf of itself and its affiliated companies filed a consolidated excess profits tax return for 1944 similarly claiming an excess profits credit carryover from the year 1942, arising in part from the same claimed $50,000,000 war losses of 1941, which carryover also eliminated any excess profits tax liability for the year 1944.

In 1947, in the course of the audit of Standard Oil's 1941 income tax return, the Internal Revenue Agent in charge of the audit of Standard Oil's tax returns, specifically called the attention of Standard Oil to the fact that no deduction for the $50,000,000. of alleged "war losses" had been claimed by Standard Oil in computing normal tax net income for income tax purposes for the year 1941. He also pointed out to Standard Oil that, if it claimed such alleged "war losses" as deductions in computing normal-tax net income for the year 1941, the Internal Revenue Service would, subject to substantiation of such alleged "war losses", allow them as deductions in computing normal-tax net income for 1941. Standard Oil states that it did not claim this item of war losses in computing normal-tax net income because "at that time the excess profits credit carryover from 1945 was known and was more than sufficient in amount to eliminate any excess profits tax in 1943 and to eliminate any problem incident to determining and reporting war loss recoveries." As the head of its tax department explained: in 1947, at the time of the audit of the 1941 income tax return, the allowance of the

3. The statute is I.R.C. of 1939, Section 13, Tax on Corporations in General, as amended by the addition of Section 127, I.R.C. of 1942—War Losses, Chapter 1—Income Tax, and Chapter 2—Additional Income Tax—Subchapter E—Excess Profits Tax, Sec. 710, 711, 728, 729. The effect of the amendment by Section 127 was to permit a corporate taxpayer to claim "war losses" as ordinary loss deductions in computing normal tax net income.

war loss for excess profits tax purposes "did not appear to be of any consequence" because even without taking into account any deduction for the war loss, Standard Oil's consolidated net income during the war years did not exceed the minimum return which any taxpayer was permitted to earn without liability for excess profits tax. In any event, there was sufficient excess profits credit carryback from 1945 to take care of any excess profits tax for 1943, if the carryover for 1941 were not allowed.

In 1950, the Supreme Court of the United States affirmed the District Court for the District of New Jersey which had held that the wiping out of a tax liability deficiency after assessment by a carryback did not wipe out the liability to pay interest from the due date to the date of the assessment (1948). Seeley Tube & Box Co. v. Manning, D.C., 76 F.Supp. 937; affd. 338 U.S. 561,[4] 70 S.Ct. 386, 94 L.Ed. 346.

In 1954, the Collector sent taxpayer a notice of assessment for interest due on the potential deficiencies for the years 1943 and 1944 from their respective due dates to March 15, 1946 the date on which these deficiencies abated by the application of the unused excess profits credit carryback from the year 1945. The deficiencies arose out of the disallowance of the war losses which taxpayer had used to effect an unused excess profits credit carryover from 1941.

Section 710(c) as amended by I.R.A. of 1942 permitted adjustments to be made in the taxable year by way of carry-backs of unused excess profits credits from the two subsequent years in addition to carryovers from the two preceding taxable years, and defined "unused excess profits credits" as the excess in a taxable year of the excess profits tax credit over the excess profits net income for such year. (Sec. 710(c)(2))

Standard Oil, therefore, in computing its consolidated adjusted excess profits net income for the years 1943 and 1944 could avail itself of the benefits of an *unused* excess profits tax credit carryover, if any, from the year 1941 (and, in turn, any resultant carryover from the year 1942).

There is no dispute concerning the amount of Standard Oil's excess profits tax credit for the year 1941. But there is dispute concerning the amount of Standard Oil's excess profits net income for the year 1941 and specifically whether or not such excess profits net income could be reduced by the alleged "war losses" (never claimed as deductions by Standard Oil in computing normal-tax net income for income tax purposes) so as to increase its unused excess profits credits.

That this may not be done, the Government says, is evident from the specific adjustments which may be made in computing excess profits net income as enumerated in Sec. 711(a) : 1) on the basis of net income or 2) on the basis of invested capital—adjustments, the nature of which is not remotely related to war losses.

Plaintiff attempts to find support for its argument that the war loss "deduction" was mandatory rather than elective in the language of Section 127(a)(2) that "[p]roperty * * * *shall be deemed to have been destroyed or seized* on the date war * * * was declared * * *" and in (b)(1) that the amount of loss *"shall be determined * * *"*, coupled with the language of Section 23 which provides that losses sustained by a taxpayer *"shall be allowed"* as deduction.

The only choices open to a taxpayer, says plaintiff, were (1) as to the date of loss in the case of certain property, and (2) as to decreasing the amount of such

4. The applicability of the principle of Seeley Tube to the facts here was expressly stated by the Court of Appeals (Standard Oil v. McMahon, etc., supra) and does not appear to have been questioned. "First, it is settled that the Government is entitled to interest if the asserted 'deficiencies' did exist for a period of time." (244 F.2d at p. 13)

loss by the discharge of certain liabilities or obligations.

This argument ignores the fact that any deduction including a war loss deduction which "shall be allowed" under Section 23 presupposes a claim of such loss by a taxpayer in his return. The fixing of the time of the war loss fixes the time that the claim accrues and thus imposes a limitation on the right to make such claim. This is recognized by plaintiff when it says it is a principle of general application that a taxpayer cannot determine "when he will have it and when he will not" (have the loss)—but what plaintiff does not recognize is that the application of the time principle presupposes the existence of a *claim* for such loss. The right was there; the "loss" was suffered but the assertion of a claim based upon this right was not made.

Plaintiff also invokes the language of Regulation 111, (Sec. 29.1(a)(1)) to the effect that upon the date specified in Sec. 127(a) supra, "the taxpayer is treated as losing his entire interest in such property" and (b)(1) that "the loss * * * is determined as if the taxpayer's interest in such property had ceased" by reason of such determination or seizure. This language, says plaintiff, makes it clear that the statute and the regulation determine the loss with no election on taxpayer's part. But this overlooks the fact that it is further provided that "the loss is determined in the same manner as in the case of any other loss by casualty" (Sections 29.23(e)–1 and (f)–1); this obviously requires a *claim* of loss just as with any other loss.

Further, plaintiff points to Section 29.127(a)–2(c) of Reg. 111, which provides a limited choice for the date of loss for certain property; and also in the event of the failure of taxpayer to make such choice, fixes the date. "Until the taxpayer makes such a choice upon a return, a claim, or a petition, he will be deemed to have chosen the latest date on which the destruction or seizure may be treated as having occurred. Such latest date will be considered for all purposes

the date chosen by the taxpayer if the taxpayer has not chosen on a return, claim, or petition, in the manner described above, any other date by the time the return for the period in which such latest date falls is due (including any extension of time for filing such return)."

This language, plaintiff argues, is a clear indication that the deduction is mandatory, since whether or not taxpayer claims the loss, he is treated as having sustained it on a particular date. The language quoted is not all that broad—the failure to claim the loss which fixes the arbitrary date is modified by the words "until the taxpayer makes such a choice upon a return, a claim, or a petition * * *" and "if the taxpayer has not chosen on a return a claim or a petition * * *". Similarly, Section 29.-127(f)–1 of the Regulation defines the "deductions allowed as those claimed "in a return, in a claim for credit or refund * * * or in a petition to the Tax Court", and those which "not so claimed by the taxpayer, were nevertheless allowed (for example, by the Commissioner, a court, or the Tax Court) * * *".

■ From this, plaintiff would have us conclude that the Commissioner, or the Tax Court, or some Court could compel a taxpayer against his will to take the deduction and thus effect a "mandatory deduction allowed" although taxpayer has chosen not to claim such a deduction. Contrary to what taxpayer reads in this Regulation, we see one requisite to the allowance of any deduction and that is that the claim which is allowed must be brought to the attention of the Collector by some affirmative action of taxpayer, whether by way of return, petition, pleading or conference.

The amendment under the Act of 1951 to Section 127(c) which dealt with recoveries pointed up the choice which lay in the hands of the taxpayer and the considerations which went into making a choice to deduct or not deduct a war loss.

Under Section 127, as originally enacted, if taxpayer claimed a war loss de-

duction with respect to property "A" but had elected not to claim a war loss deduction with respect to property "B", and after the war, property "B" was recovered, and property "A" was not, the taxpayer was required to include the value of recovered property "B" in income to the extent of the deduction previously claimed on property "A". Congress in the 1951 Act recognized the unfairness of this result since it deprived the taxpayer, in some measure, of the benefits to which he should have been entitled in making the original election not to claim a war loss deduction with respect to property "B". The effect and purpose of the amendment was to grant a taxpayer, who made an election not to claim a war loss deduction with respect to property "B" but claimed the deduction with respect to property "A", an exemption from tax on the recovery of property "B" with respect to which the taxpayer had elected not to claim a war loss deduction.

That the tax treatment of "recoveries" under Section 127(c) was dependent on "deductions allowed" under Section 127 (a) and that the two sections must be read together, was the clear holding of Keeler v. Commissioner of Internal Revenue (180 F.2d 707 (10th Cir., 1950)).

The plan of the statute was to treat the value of the property on the date of war as a "deductible loss", said Judge Hand, and to treat any recovery as a gain or loss—depending on whether the owner had "deducted the loss to which the section entitled him." Kenmore v. C. I. R., 205 F.2d 90 at 92 (2nd Cir., 1953). The election not to claim a war loss deduction did not relieve the taxpayer of the burden of showing a "recovery" of the property in order to claim a deduction for a casualty loss occurring after the war with respect to such property which for this purpose under the statute was deemed lost but such election did affect the nature and extent of the inclusion in income of the value of the recovered property.

Finally, Standard Oil quotes from the Tax Court (which was affirmed by the Court of Appeals in Shahmoon v. C. I. R., 185 F.2d 384 (C.A. 2, 1950) 13 T.C. 705, 706, 707 (1949)):

> "A taxpayer has no election under section 127(a)(2) which allows him to deduct his basis for the property as a loss at the time of the declaration of war, and, having been allowed to recover his basis in that way, he can not recover it later, either as a loss or through depreciation." (Emphasis added)

This statement that the taxpayer has lost his entire bases in the properties under Section 127(a)(2) is tantamount, according to plaintiff, to a holding that "the loss was deductible in the year sustained whether or not claimed by the taxpayer." We do not so read it. There, as in Kenmore, supra, the taxpayer was seeking to take depreciation on property subject to the war loss provisions which it had not claimed as a deduction, without establishing a recovery; and the Court held that the basis of depreciation under Section 127 was a "total loss" whether claimed by taxpayer or not, and that before taxpayer could claim any depreciation he had to show a recovery of this property (which was presumed a total loss). The Court made it clear that the compulsory basis of total loss for depreciation purposes had nothing to do with taxpayer's choice whether to deduct this as a total loss for purposes of taxing a later recovery.

Finally, Standard Oil argues that Chapter I—Income Tax—and Chapter 2—Excess Profits Tax—are separate taxes and that a mistake of law as to Chapter I is not binding on either party for purposes of Chapter 2. The "mistake" theory flows from the assumption—which we hold is not valid—that taxpayer or the Commissioner was compelled to deduct the war loss for income tax purposes, that it or they mistakenly did not deduct it and that, in either event, the error should now be partially corrected

by deducting it from excess profits income. That is, that this Court should now employ "the correct treatment of such item or transaction" in determining taxpayer's excess profits tax liability. (Cf. Leonard Refineries v. C.I.R., 11 T.C. 1000, 1006 (1948).) But, there was no obligation on the part of taxpayer or the Commissioner to deduct the war losses—the choice was with plaintiff; and, the Commissioner, in fact, though not so obligated, did call to the attention of plaintiff Standard Oil that it could claim such deduction and had not. Plaintiff deliberately chose not to—for reasons which were clearly set forth by its officers. "He cannot at this late date disavow that election." Keeler v. Commissioner, supra, 180 F.2d p. 710. (See 7-A Mertens, Law of Federal Income Tax, Secs. 42.38, 42.58; and Cf. Mercantile National Bank at Dallas v. Commissioner, 276 F.2d 58 (5th Cir., 1960); Bank of America Trust and Savings Association v. United States, 303 F.2d 304 (9th Cir., 1962), cert. denied, 371 U.S. 861, 83 S.Ct. 119, 9 L.Ed.2d 99, rehearing denied, 371 U.S. 906, 83 S.Ct. 205, 9 L.Ed.2d 167.)

The illogic of permitting a deduction of a war loss for purposes of excess profits income while not requiring it for purposes of normal net income would lie in the fact that a taxpayer could under Section 127(c)(2) recover that property and not have it included in its gross income because it "did not result in a reduction of [income] tax under this chapter" (Chapter I) while benefiting from such deduction for excess profits tax.[5]

Having failed to exercise its election under Chapter I, taxpayer may not exercise it under Chapter 2. The motion is granted and the Clerk is directed to enter judgment dismissing the complaint with costs to be taxed.

So ordered.

---

5. While the inequities of the present tax situation of Standard Oil are entirely immaterial, the Government does point out that Standard Oil exercised its election not to claim the alleged "war losses" as a deduction, to avoid certain tax consequences upon the recovery of property subject to the war loss provisions of Section 127. We find no occasion to pass upon the merits of this intention.

We have noted that, in 1951, Congress granted taxpayers an election which, in effect, enabled them to exclude recoveries of war loss property from income in return for "paying back" the tax benefits derived from the deduction of war losses. The Government contends, however, that, if such election were made, the excess of the taxes paid on the recovery of the war loss property over the taxes saved on the war loss property over the taxes saved on the war loss deduction was to be refunded to the taxpayer without interest. Treasury Regulation 118, Section 39.127(c)–1(d) (4). The interest which Standard Oil saved by electing not to claim the alleged "War Losses" as a deduction in 1941 for income tax purposes greatly exceeds the amount of interest in dispute herein.