MARTIN–MARIETTA CORPORATION
v.
The UNITED STATES.
No. 245–67.

United States Court of Claims.
Nov. 14, 1969.

Davis, J., dissented.

———◆———

Clyde Y. Morris, Baltimore, Md., attorney of record, for plaintiff. Miles & Stockbridge, Baltimore, Md., of counsel.

Edna G. Parker, Washington, D. C., with whom was Asst. Atty. Gen. John-nie M. Walters, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION

LARAMORE, Judge.

This is an action to recover additional statutory interest in the amount of $1,825,585.59 for the years 1954 and 1955, and assessed interest in the amount of $23,780.10 for the year 1954. The issues presented involve the extent to which section 1481 of the Internal Revenue Code of 1954 [1] is applicable to the instant case, and the dates at which *overpayments* of corporate income taxes, within the meaning of section 6611(a) and (b), occurred for the years in question. The facts are as stipulated and will be recited here only to the extent necessary to explain the basis for our decision that plaintiff is entitled to recover.

Plaintiff, Martin-Marietta Corporation, is successor by consolidation to The Martin Company, formerly The Glenn L. Martin Company. At all times material to this case, plaintiff was primarily engaged in the design, development and production of aerospace vehicles, electronics equipment, communications equipment and guided missiles. Substantially all of plaintiff's sales during ths period were to the U.S. Government or agencies thereof, and were subject to the provisions of the Renegotiation Act of 1951, 65 Stat. 7, 50 U.S.C. App. (1958 Ed.) § 1211 *et seq.* With respect to the tax years involved in this suit, calendar years 1951 through 1955, plaintiff kept its books and filed its tax returns on the accrual method of accounting and the calendar year basis.

Plaintiff had, for the years 1951 and 1952, net operating losses of $10,919,797.32 and $20,362,485.40, respectively, and no excessive profits under the Renego-

---

[1] All citations to Code sections hereinafter are, unless otherwise indicated, in reference to the Internal Revenue Code of 1954.

tiation Act. Accordingly, at the beginning of 1953, plaintiff had available to it a net operating loss carryover in the amount of $31,282,282.72. Since the available loss carryover far exceeded 1953 net income, plaintiff paid no Federal income tax for that year. For 1954, plaintiff paid Federal income tax of $1,042,829.10, including a tax deficiency of $140,756.20 assessed and collected in 1958, plus assessed interest on the deficiency in the amount of $23,780.10. For 1955, plaintiff paid Federal income tax of $10,744,751.72.

In April 1957, the Renegotiation Board determined that plaintiff had excessive profits for 1953 in the amount of $3,162,759. After payment to the Department of the Air Force (the contracting agency), on July 16, 1957, of the full amount of such excessive profits, plus interest at the rate of four percent as provided by the Renegotiation Act, plaintiff filed a petition for a redetermination with the U.S. Tax Court. Prior to payment, plaintiff was notified by the Internal Revenue Service that since it paid no income tax for 1953, plaintiff was not entitled to any tax credit under secton 3806(b) of the Internal Revenue Code of 1939 for that year.[2] The Tax Court, in December 1964, affirmed the action of the Renegotiation Board.

On or about September 30, 1958, the Renegotiation Board determined that plaintiff had excessive profits for 1954 in the amount of $5,868,319. Pursuant to demand by the Department of the Air Force for payment of that amount, plus interest at the rate of four percent, plaintiff, in January 1959, posted a bond for the amount claimed and filed a petition for a redetermination with the U.S. Tax Court. The action of the Renegotiation Board was affirmed by the Tax Court in December 1964, and plaintiff paid the full amount of 1954 excessive profits, plus interest, to the Department of the Air Force on or about

October 15, 1965. Prior to such payment, on September 24, 1965, plaintiff had been advised by the Internal Revenue Service that for 1954 it had no tax credit, under section 1481(b) of the Internal Revenue Code of 1954, to apply against the renegotiated excessive profits for that year.

In August 1959, the Renegotiation Board determined that plaintiff had excessive profits for 1955 in the amount of $2,979,747. Pursuant to demand by the Department of the Air Force for payment of that amount, plus interest at the rate of four percent, plaintiff, on or about December 3, 1959, posted a bond for the amount claimed and filed a petition for a redetermination with the U.S. Tax Court. Plaintiff was advised by the Internal Revenue Service on October 16, 1959 and again on September 24, 1965, after the Tax Court had affirmed the action of the Renegotiation Board, that for 1955 plaintiff had a tax credit, under section 1481(b), of $1,549,468.19 to apply against the renegotiated excessive profits for that year. Plaintiff had, however, already paid the principal amount of $1,430,278.81 ($2,979,747 of 1955 excessive profits less the tax credit of $1,549,468.19), plus interest, to the Department of the Air Force on or about June 9, 1965.

The excessive profits determination for 1953 by the Renegotiation Board had the effect of reducing plaintiff's net income for that year by the amount of the determination ($3,162,759) and, correspondingly, increasing to $22,087,145.87 the net operating loss carryover available to plaintiff for 1954. Since plaintiff's net income for 1954 before (1) taking into account the net operating loss deduction available from previous years and (2) renegotiation for 1954, was $21,025,076.48, plaintiff overpaid its income tax for 1954 by $1,042,829.10, the entire amount of tax paid by plaintiff for that year.

2. Section 3806 of the Internal Revenue Code of 1939 is the predecessor of, and substantively identical to, section 1481 of the Internal Revenue Code of 1954.

Similarly, the excessive profits determination for 1954 by the Renegotiation Board reduced plaintiff's net income for that year by the amount of the determination ($5,868,319), and increased to $6,930,388.39 the net operating loss carryover available to plaintiff for 1955. Plaintiff's net income for 1955, again before (1) taking into account the net operating loss deduction from previous years and (2) renegotiation for 1955, was $20,751,501.10. Plaintiff's net income for 1955, *after* the net operating loss deduction, but before renegotiation, was $13,821,112.71 on which the tax payable was $7,164,081.47. Consequently, plaintiff overpaid its Federal income tax for 1955 in the amount of $3,580,-670.25.

On or about June 24, 1966, the Internal Revenue Service notified plaintiff of overassessments of taxes for 1954 and 1955 in the amounts of $1,042,829.10 and $3,580,670, respectively, and refunded those amounts to plaintiff. Statutory interest of $558,770.69 was allowed on the refund of 1954 tax for the period from July 16, 1957, to June 21, 1966. Statutory interest of $439,871.89 was allowed on the refund of 1955 tax, in part for the period from July 16, 1957 to June 21, 1966, and in part from October 15, 1965 to June 21, 1966. The date of July 16, 1957 is the date on which plaintiff paid its excessive profits for the year 1953, and October 15, 1965 is the date on which plaintiff paid its excessive profits for the year 1954. The Internal Revenue Service did not refund the $23,780.10 assessed interest which had been paid on account of the tax deficiency asserted against plaintiff for 1954. No statutory interest was allowed, moreover, for the period from the respective dates of payment of 1954 and 1955 taxes, to the respective dates of payment of 1953 and 1954 renegotiated excessive profits. These amounts of assessed and statutory interest retained by the government constitute the basis of the present suit.

Section 6611 provides with respect to interest on overpayments, in parts pertinent to this suit, that:

(a) Rate.—Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax at the rate of 6 percent per annum.

(b) Period.—Such interest shall be allowed and paid as follows:

\* \* \* \* \* \*

(2) Refunds.—In the case of a refund, from the date of the overpayment to a date (to be determined by the Secretary or his delegate) preceding the date of the refund check by not more than 30 days, whether or not such refund check is accepted by the taxpayer after tender of such check to the taxpayer. The acceptance of such check shall be without prejudice to any right of the taxpayer to claim any additional overpayment and interest thereon.

The applicable Treasury Regulations specify, moreover, with respect to the computation of interest on an overpayment, that:

\* \* \* [T]he dates of overpayment of any tax are the date of payment of the first amount which (when added to previous payments) is in excess of the tax liability \* \* \* and the rate of payment of all amounts subsequently paid with respect to such tax liability. Treasury Regulations on Procedure and Administration (Internal Revenue Code of 1954), § 301.-6611–1(b).

Plaintiff's theory for recovery is that absent some specific statutory exception to the above-quoted Code provision, the general interest rules of section 6611 are controlling, whereby plaintiff is entitled to statutory interest on the refunded taxes from their respective dates of overpayment. Plaintiff considers these dates to have been the original dates of payment of the refunded taxes. Defendant's opposition arises from its belief that the tax refunds for 1954 and 1955 had their roots in section 1481, which provides for tax adjustments to earlier years after renegotiation. But for the effect of section 1481, defendant urges, there would have been no adjust-

ments to trigger the resultant overpayments. Accordingly, defendant maintains that section 1481 *alone* is controlling whereby plaintiff is entitled to no interest, except perhaps as specifically limited by section 1481(b) (3), for the periods prior to repayment of its renegotiated excessive profits. Defendant alternatively opposes recovery by plaintiff on the basis of the so-called use-of-money principle, which imparts that the government need not pay statutory interest on refunded taxes for the period during which it was entitled to such taxes. This period did not end and there was, therefore, no overpayment of taxes, defendant continues, until plaintiff repaid its renegotiated excessive profits. We conclude that defendant's positions are not well taken.

## I

Section 1481,[3] the tax provision upon which much of the present controversy

---

3. The provisions of section 1481, in pertinent detail, are as follows:

"SEC. 1481. MITIGATION OF EFFECT OF RENEGOTIATION OF GOVERNMENT CONTRACTS.

"(a) *Reduction for Prior Taxable Year.*—

"(1) *Excessive profits eliminated for prior taxable year.*—In the case of a contract with the United States or any agency thereof, or any subcontract thereunder, which is made by the taxpayer, if a renegotiation is made in respect of such contract or subcontract and an amount of excessive profits received or accrued under such contract or subcontract for a taxable year (referred to in this section as 'prior taxable year') is eliminated and, the taxpayer is required to pay or repay to the United States or any agency thereof the amount of excessive profits eliminated or the amount of excessive profits eliminated is applied as an offset against other amounts due the taxpayer, the part of the contract or subcontract price which was received or was accrued for the prior taxable year shall be reduced by the amount of excessive profits eliminated.

\*          \*          \*          \*          \*

"(3) Deduction disallowed.—The amount of the payment, repayment, or offset described in paragraph (1) or paragraph (2) shall not constitute a deduction for the year in which paid or incurred.

\*          \*          \*          \*          \*

"(b) *Credit Against Repayment on Account of Renegotiation or Allowance.*—

"(1) *General rule.*—There shall be credited against the amount of excessive profits eliminated the amount by which the tax for the prior taxable year under this subtitle is decreased by reason of the application of paragraph (1) of subsection (a); \* \* \*.

"(2) *Credit for barred year.*—If at the time of the payment, repayment, or offset described in paragraph (1) \* \* \* of subsection (a), refund or credit of tax under this subtitle for the prior taxable year is prevented (except for the provisions of section 1311) by any provision of the internal revenue laws other than section 7122, or by rule of law, the amount by which the tax for such year under this subtitle is decreased by the application of paragraph (1) \* \* \* of subsection (a) shall be computed under this paragraph. There shall first be ascertained the tax previously determined for the prior taxable year. The amount of the tax previously determined shall be the excess of—

"(A) the sum of—

"(i) the amount shown as the tax by the taxpayer on his return (determined as provided in section 6211(b) (1), (3), and (4)), if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus

"(ii) the amounts previously assessed (or collected without assessment) as a deficiency, over—

"(B) the amount of rebates, as defined in section 6211(b) (2), made. There shall then be ascertained the decrease in tax previously determined which results solely from the application of paragraph (1) \* \* \* of subsection (a) to the prior taxable year. The amount so ascertained, together with any amounts collected as additions to the tax or interest, as a result of paragraph (1) \* \* \* of subsection (a) not having been applied to the prior taxable year, shall be the amount by which such tax is decreased.

"(3) *Interest.*—In determining the amount of the credit under this subsection no interest shall be allowed with respect to the amount ascertained under paragraph (1); except that if interest is charged by the United States or the agency thereof on account of the disallowance for any period before the date of the payment, repayment, or offset, the credit shall be increased by an amount equal to interest on the amount ascertained under such paragraph at the same rate and for the

**506**

centers, sets forth in its initial subsection the general rule with respect to renegotiated excessive profits, as follows:

> * * * [T]he part of the contract or subcontract price which was received or was accrued for the *prior taxable year* shall be reduced by the amount of excessive profits eliminated.
>
> * * * [Emphasis supplied.]

The general rule of section 1481(a)(1), as supplemented by the deduction prohibition of section 1481(a)(3), evidences a congressional determination that the proper tax treatment of renegotiated excessive profits requires a downward adjustment in income for the prior taxable year of receipt, instead of a deduction from income in the later year of repayment.

Section 1481(b) provides, with respect to the tax consequences incident to the above-authorized adjustment to income, that:

> There shall be *credited* against the amount of excessive profits eliminated the amount by which the *tax for the prior taxable year* under this subtitle *is decreased* by reason of [the elimination from prior taxable year income of such renegotiated excessive profits] * * *. [Emphasis supplied.]

Moreover, interest is allowed with respect to a credit, if at all, only to the limited extent provided by section 1481(b)(3).

Defendant's efforts at limiting plaintiff's recourse to section 1481 *only* are doubtless attributable to the restricted interest provisions contained therein. Because the restricted interest rules of section 1481(b)(3) are dependent for their operation upon the existence of a tax

credit, defendant's task is to fit the tax refunds for 1954 and 1955 within the confines of the section 1481(b)(1) credit provision. As will be seen, this cannot be done.

The operative facts indicate that the overpayment of 1954 income tax resulted from an increase in the net operating loss carryover ultimately available to plaintiff for that year. The beneficial increase (which completely absorbed plaintiff's 1954 income) stemmed not, however, from the elimination of excessive profits for 1954, but rather from the elimination of such profits for 1953. Accordingly, there was no existing 1954 tax liability for the 1954 renegotiated excessive profits to reduce, prerequisite to the application, *by its own terms*, of the section 1481(b) credit. Similarly, part of the overpayment of 1955 income tax resulted from an increase in the net operating loss carryover available to plaintiff for that year. The increased carryover, again, stemmed not from the elimination of excessive profits for 1955, the *relevant tax year*, but rather from the elimination of such profits for earlier years. Thus, the decrease in 1955 tax liability engendered by the increased loss carryover had neither roots in, nor relationship to, the renegotiated excessive profits for 1955. With the section 1481(b) credit provision expressly inapposite, the conditional restricted interest rules of section 1481(b)(3) clearly are not operative.

Indeed, the Internal Revenue Service plainly recognized the correctness of the adjustments detailed above when it *refunded* to plaintiff the overpayments involved, with notice that plaintiff was not entitled to a tax credit under section 1481(b). Significantly, that part of the

---

period (prior to the date of the payment, repayment, or offset) *as interest is so* charged.

"(c) *Credit in Lieu of Other Credit or Refund.*—If a credit is allowed under subsection (b) with respect to a prior taxable year no other credit or refund under the internal-revenue laws founded on the application of subsection (a) shall be made on account of the amount allowed

with respect to such taxable year. If the amount allowable as a credit under subsection (b) exceeds the amount allowed under such subsection, the excess shall, for purposes of the internal revenue laws relating to credit or refund of tax, be treated as an overpayment for the prior taxable year which was made at the time the payment, repayment, or offset was made."

decrease in plaintiff's 1955 tax liability, triggered by the elimination of excessive profits for 1955, was properly credited in accordance with section 1481(b) against the amount of such profits repaid for that year.

Defendant's efforts at limiting plaintiff's recourse to section 1481 alone are further thwarted by the Internal Revenue Service's position taken, in Revenue Ruling 67–121, 1967–1 Cum.Bull 363, with respect to the relationship between section 1481 and section 6611. There, most of the taxpayer's income for the year 1955 was derived from contracts which were subject to renegotiation. Subsequently, in 1958, the taxpayer sustained a net operating loss which was carried back to, and allowed as a net operating loss deduction for, 1955. Taxpayer's 1955 income was thereby completely eliminated, with the unused portion of the 1958 loss allowed as a deduction in 1956. In 1959, the Regional Renegotiation Board ordered taxpayer to repay excessive profits earned in 1955, which profits were ultimately repaid in 1966.

The Revenue Ruling described the effect of the events which had transpired as follows, at page 364:

> * * * As a consequence of the elimination of excessive profits for 1955 under the renegotiation agreement and the *resultant decrease in taxable income for 1955*, the portion of the 1958 loss previously used as an offset against such eliminated income became available for carryback to 1956. [Emphasis supplied.]

The decrease in taxable income for 1955 was dictated by section 1481(a) (1), and the consequent loss carryback to 1956 produced an overpayment of taxpayer's income tax for 1956. The Internal Revenue Service ruled with respect to the status of such an overpayment, at page 365:

> * * * Any overpayment of income tax resulting from an increase in the portion of the 1958 net operating loss carryback to 1956 *attributable to the renegotiation* of 1955 income is an overpayment of 1956 tax. As such, it is *not a credit* for the year 1955 or 1956 *under section 1481(b) (1)* of the Code but is subject to *credit or refund under section 6402* of the Code. [Emphasis supplied.]

The Service also ruled that interest was allowable on the 1956 overpayment, the amount of such interest to be determined in accordance with section 6611.[4] Clearly, the section 1481(a) income adjustment provision was deemed capable of operation independent of the section 1481(b) credit provision; the taxpayer was not relegated to exclusive reliance upon section 1481. *See*, Midvale Co. v. United States, 124 F.Supp. 678, 129 Ct. Cl. 483 (1954). This is precisely the stance taken by plaintiff here.

Perhaps the most basic weakness in defendant's position is indicated by the very Code section upon which it relies. That is to say, the provisions of section 1481 simply do not speak to the case now before us; no mention is made of the situation where a taxpayer is properly entitled to a refund of tax and interest thereon, instead of a credit.[5] But once

---

4. The Service ruled, on the issue of interest, that it accrued from the date of repayment of the taxpayer's renegotiated excessive profits. This ruling, upon which we pass no opinion, was made on the basis of section 6611(f) (1), a specific statutory exception to the general interest rules. It has no application to the case before us, however, which involves the *carryforward* of losses already sustained, and the absence of an apposite statutory exception to the general interest rules.

5. For cases in which the section 1481(b) credit provision was properly applicable, *see* Standard Roofing & Material Co. v. United States, 199 F.2d 607 (10th Cir. 1952); Overlakes Corp. v. Commissioner of Internal Revenue, 41 T.C. 503 (1964), aff'd per curiam, 348 F.2d 462 (2d Cir. 1965), cert. denied, 382 U.S. 988, 86 S.Ct. 547, 15 L.Ed.2d 475 (1966).

it is recognized, and we do so here, that the income adjustment and credit provisions of section 1481 are capable of operation independent of each other it follows, and we hold, that with regard to the refunds in question the general interest rules of section 6611 properly control.

## II

Defendant alternatively opposes recovery by plaintiff on the theory that until its renegotiated excessive profits (for 1953 and 1954, respectively) were later repaid, plaintiff had a duty and obligation to pay the full amount of its taxes for 1954 and 1955, and the government had a corresponding right to the use of the funds without payment of interest. This is so in the instant case, defendant continues, because there *were* no overpayments of taxes for 1954 and 1955 within the meaning of section 6611 until repayment of the renegotiated excessive profits for 1953 and 1954, respectively; the resulting overpayments having been generated by the repayment of such profits in the first instance. Thus, in accordance with its proposition that "an overpayment resulting from a later event cannot, as a practical matter, occur any earlier than the date of that later event," defendant concludes that plaintiff is entitled to no interest for the period prior to the repayment of its renegotiated excessive profits. Defendant's conclusion, in the circumstances of this case, is unjustified.

The so-called use-of-money principle relied upon by defendant has generally been attributed to the decision of the Supreme Court in Manning v. Seeley Tube & Box Co., 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346 (1950). *Manning* involved the question whether interest on a properly assessed tax deficiency is abated when the deficiency itself is extinguished by the carryback of a net operating loss sustained in a subsequent year. In holding that the taxpayer was not entitled to a refund of the assessed interest, the Supreme Court stated at pages 565–566, 70 S.Ct. at page 389:

* * * From the date the original return was to be filed until the date the deficiency was actually assessed, the taxpayer had a positive obligation to the United States: a duty to pay its tax. [Citations omitted.] For that period the taxpayer, by its failure to pay the taxes owed, had the use of funds which rightfully should have been in the possession of the United States. The fact that the statute permits the taxpayer subsequently to avoid the payment of that debt in no way indicates that the taxpayer is to derive the benefits of the funds for the intervening period.

The critical subsequent *operational* event in *Manning*, the very presence of which portrayed as reasonable the result reached, is absent, however, from the case under review. *See also*, Standard Oil Co. v. United States, 224 F.Supp. 913 (S.D.N.Y.1963). There can be little doubt in *Manning* that prior to the net operating loss in the subsequent year which generated the carryback, the operational fact pattern necessary to fix the taxpayer's liability already was complete. The loss constituted a supervening operational event which altered the pre-existing proper tax consequences of the operational events which theretofore had transpired. Thus, although the government ultimately was not entitled to the asserted deficiency, it was properly entitled to the use of the deficiency until the loss was sustained.

In the present case, to the contrary, all of the *operational* events necessary to determine plaintiff's *ultimate* tax liability, and to properly fix any governmental right to tax funds, occurred prior to the tax years in question. That is, the overpayments for 1954 and 1955, respectively, were generated by carryovers of net operating losses, sustained in earlier years, and enlarged by renegotiation adjustments to excessive profits earned in prior years. The fact that the right to tax funds *actually* asserted by the government was subsequently limited by a judicially affirmed administrative decision surely cannot inure to defend-

ant's benefit. That decision, pursuant to which plaintiff repaid its renegotiated excessive profits, merely delineated the proper treatment for tax purposes of an earlier operational event (the reporting of excessive profits earned in the year prior to the particular tax year involved). A legal determination of this nature is quite different from the subsequently sustained net operating loss in *Manning*. In the instant case, the later event revealed that in the relevant tax years plaintiff, not the government, was properly entitled, based upon the *then* existing operational events, to the use of the taxes which were later refunded. The use-of-money principle is, therefore, of no assistance to defendant.

We conclude that, for the tax years under review, payments were made by plaintiff in excess of its final tax liability for those years which constituted overpayments, within the meaning of section 6611, *on the dates of actual payment*. Accordingly, plaintiff is entitled to recover the additional statutory interest sought. This decision must in no sense be deemed a penalty imposed upon the government. The government merely had the use of certain funds, the use of which properly belonged to plaintiff. Thus, the interest recovered in this suit must be viewed as compensation for plaintiff's lost use of its funds, or the transferral of the benefit incident to the use of such funds from the government to the proper recipient. Furthermore, if any net benefit accrues to plaintiff because of a differential between the amount of interest received on the overpayments and the amount paid on the repayments of related renegotiated excessive profits, such is the result dictated by the statute.

### III

As previously mentioned, on March 4, 1958, plaintiff paid a tax deficiency for the year 1954 in the amount of $140,-756.20, plus assessed interest of $23,-780.10. In June 1966, the Internal Revenue Service refunded to plaintiff all the tax paid for 1954, including the $140,-756.20 deficiency. The $23,780.10 of assessed interest paid by plaintiff, however, was not refunded. Defendant contends that the assessed-interest issue is governed by the decision in Standard Roofing & Material Co. v. United States, 199 F.2d 607 (10th Cir. 1952), which precludes plaintiff's recovery of such interest. We do not agree.

In *Standard Roofing*, it was determined pursuant to renegotiation in 1944 that the taxpayer had reported $50,000 of excessive profits for 1942. In 1945, a deficiency in 1942 tax of $45,000 was assessed against the taxpayer, based upon income and excessive profits for that year including the $50,000. The taxpayer was properly allowed a credit, in the amount of the decrease in 1942 tax resulting from the elimination of the $50,000, against the amount of excessive profits to be repaid. The taxpayer further contended, however, that the deficiency computation for 1942 should have been made *after* elimination of the $50,000 of excessive profits from income. The court disagreed with the taxpayer, dismissing its contention with the following remarks, at page 609:

> * * * [T]he taxpayer's computation has the effect of retroactively excluding the $50,000.00 excessive profits to the timely filing of the return, *operating as an offset to income subsequently included, thus eliminating a greater portion of the interest on the additional tax*. It is apparent that taxpayer's proposed computation does no more than reduce the total liability by approximately the amount of interest paid on the deficiency taxes assessed. [Emphasis supplied.]

The *Standard Roofing* decision stands for the proposition that where a taxpayer qualifies for a statutory excessive profits credit, the renegotiated excessive profits cannot also offset other income, the subject of a deficiency assessment, and thereby extinguish interest on the deficiency. The decision is not in point, however, with respect to the case before us in which any excessive profits credit is expressly inapposite, all 1954

income having been eliminated by the carryover of net operating losses sustained in earlier years.[6]

In further contravention of the position taken by defendant, we refer to Treasury Regulations section 301.6611–1 (c), Example (2). The taxpayer, in the example, reported and paid a tax liability of $50,000. Thereafter, an assessed deficiency in the amount of $10,000 was paid by the taxpayer. Upon the subsequent determination that taxpayer's correct tax liability for the year in question was only $35,000, the example concludes its analysis of taxpayer's $25,000 overpayment with the following statement:

> The amount of any interest paid with respect to the deficiency of $10,000 is also an overpayment.

We see no meaningful distinction between the above example and the assessed-interest issue under review. Accordingly, we conclude that plaintiff is entitled to recover the assessed interest in question. The judgment for plaintiff will be determined pursuant to Rule 131 (c).

DAVIS, Judge (dissenting):

The solution to this case lies in one's evaluation of the scope and purpose of Section 1481 of the 1954 Code. The court applies subsection (a), but then, taking subsection (b) strictly and literally, finds that Congress has made no provision for a case like this in which the renegotiation affects loss-years or years in which there can be no tax "credit" (in the strict use of that term). Therefore, the court holds, the ordinary rules as to interest must apply (after subsection (a) has had its effect). My difference with the court is that I think that Congress intended Section 1481, as a whole, to govern the tax adjustments due to the repayment of excessive profits, and that we should seek to reach that goal by reading subsection (b) to include the present situation. I agree with the court in applying subsection (a),[1] but I do not believe that, in the circumstances here, Congress intended subsection (a) to be used without subsection (b), which takes into account the diminished interest which taxpayer had to pay on its renegotiation repayments.

In adopting Section 1481 (and its predecessor in the 1939 Code) Congress deliberately set out to harmonize the interest to be paid by the Government on tax adjustments (favorable to the contractor) resulting from renegotiation repayments with the interest paid by the contractor to the Government on those repayments. This was done in subsection (b) (3) (formerly Section 3806(b) (4)). However, since the subsection is unfortunately phrased in terms of a "credit"—and there was none here, because of the loss carryover—the court considers it wholly inapplicable to this case. I know of no reason why Congress would wish to give a preference, in recovery of interest, to a taxpayer with such a carryover loss in the renegotiated year, and neither the taxpayer nor the court suggests one. On the other hand, the principles of equality of justice would make one think that Congress intended no such arbitrary exception but desired, rather, that all renegotiated taxpayers should be treated on the same plane with regard to the relationship between the tax interest

---

6. The relationship between plaintiff's net operating loss carryovers and their enlargement by the renegotiation of excessive profits is discussed in detail in the immediately preceding part of this opinion. The reasoning underlying the preceding part, moreover, is also appropriate with respect to the instant part of this opinion.

1. Subsection (a) is broad and unqualified in its terms, and says flatly that "the part of the contract or subcontract price which was received or was accrued for the prior taxable years shall be reduced by the amount of excessive profits eliminated." Nothing indicates that Congress did not mean what it said. In this very case, the Internal Revenue Service applied subsection (a).

they would receive and the renegotiation interest they had to pay.[2]

To my mind, the language of Section 1481(b), referring to a "credit", does not preclude carrying out this Congressional purpose. The "credit" under that provision is generally considered the equivalent of a tax refund (see Universal Oil Products Co. v. Campbell, 181 F.2d 451, 478 (C.A. 7), cert. denied, 340 U.S. 850, 71 S.Ct. 78, 95 L.Ed. 623 (1950); United States v. Failla, 219 F.2d 212, 215 (C.A. 3, 1955); Miller v. Commissioner of Internal Revenue, 231 F.2d 8 (C.A. 5, 1956), aff'g 23 T.C. 565 (1954); Baltimore Foundry & Machine Corp. v. Commissioner, 7 T.C. 998, 1001–1002 (1946); Kurtzon v. Commissioner, 17 T.C. 1542, 1548–1549 (1952)) and is merely an administrative substitute for a refund (Stow Mfg. Co. v. Commissioner, 190 F.2d 723, 724–725 (C.A. 2, 1951), cert. denied, 342 U.S. 904, 72 S.Ct. 295, 96 L.Ed. 677 (1952); Midvale Co. v. United States, 124 F.Supp. 678, 682, 129 Ct.Cl. 483, 490 (1954); Holmes Projector Co. v. United States, 105 F. Supp. 690, 123 Ct.Cl. 278 (1952), cert. denied, 344 U.S. 912, 73 S.Ct. 334, 97 L.Ed. 703 (1953); Miller v. Commissioner, 20 T.C. 280, 284 (1953)). "Credit" was the expression used for those tax readjustments, in favor of the taxpayer, which ensued upon the repayment of excessive profits. With respect to this statute, therefore, the word "credited" can be read as if Congress had said "readjusted", a term which would cover both a technical credit (*i. e.* an offset) and a refund (*i. e.* where there could be no offset because no tax was owing, due to the operation of the carryover provisions). If the "credit" here is the substitute for, and has the same function as, a refund, then it makes sense to treat refunds such as those involved in this case as the equivalent of a "credit" under subsection (b), for the purpose of applying the special interest provision in subsection (b) (3). There

is no distortion of the idea underlying the word "credit" as it is used in this instance. The strain on the language is less of an obstacle, it seems to me, than the non-fulfillment of the Congressional purpose, and the unequal treatment of taxpayers basically in the same position, which are the price of the more literal reading.

I would hold, therefore, that taxpayer is entitled to recover restricted interest under the terms of Section 1481(b) (3), but not the full amount which the court allows.

---

2. Since plaintiff's situation is an unusual one, it seems probable that the draftsmen of section 1481 simply failed to realize that, in choosing the word "credit", they were picking a term which was not apt to this particular set of circumstances.